# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2016

Lyle W. Cayce
Clerk

No. 15-30164

SETH B., by and through his parents and next friends Donald and Cheryl B.; DONALD B.; CHERYL B.,

　　　　Plaintiffs - Appellants

v.

ORLEANS PARISH SCHOOL BOARD,

　　　　Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, JONES, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Under the Individuals with Disabilities Education Act and its implementing regulations, parents who disagree with a school district's evaluation of their child may be entitled to an independent educational evaluation (IEE) at public expense. The parents of Seth B., a child who had previously been diagnosed with autism, asked the Orleans Parish School Board for such an evaluation. After the board assented, Seth's parents obtained the IEE and sought reimbursement. The school board denied their request on the ground that the IEE did not conform to state criteria. A state administrative

No. 15-30164

hearing officer and the district court subsequently ruled that reimbursement was not warranted. We vacate and remand.

I

The Individuals with Disabilities Education Act (IDEA) seeks "to ensure that all children with disabilities have available to them a free appropriate public education."[1] To this end, it establishes a process by which school districts and parents collaborate to develop individualized education programs for students with disabilities. As part of this process, school districts evaluate children to assess any disabilities and determine their educational needs.[2] The IDEA and its implementing regulations also afford the parents of a child with a disability the right to an independent educational evaluation (IEE) at public expense.[3] To be eligible for public funding, an IEE must meet the same criteria used by the school district in its evaluation, "to the extent those criteria are consistent with the parent's right to an independent educational evaluation."[4]

Seth B. attended public school in New Orleans. He had been diagnosed with autism and was identified as a child with a disability under IDEA. In August 2011, Seth's parents sent the Orleans Parish School Board (OPSB) a request for an IEE. The board granted the request, offering reimbursement up to $3,000 on condition that the IEE comply with Louisiana Bulletin 1508.[5] Bulletin 1508 contains the state-mandated evaluation criteria for learning disabilities, and OPSB, like all other Louisiana public school authorities, applies Bulletin 1508 in its evaluations. The district provided a list of qualified evaluators and a link to a digital version of Bulletin 1508.

---

[1] 20 U.S.C. § 1400(d)(1)(A).

[2] 20 U.S.C. § 1414(a)(1)(C), (d)(1), (d)(3)(A)(iii).

[3] 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502.

[4] 34 C.F.R. § 300.502(e)(1).

[5] *See* Bulletin 1508—Pupil Appraisal Handbook, LA. ADMIN. CODE tit. 28, pt. CI [hereinafter "Bulletin 1508"].

2

No. 15-30164

After some correspondence with the board concerning the $3,000 cost cap, Seth's parents engaged Dr. Patricia Brockman to produce Seth's IEE. In April 2012, they sent OPSB Dr. Brockman's report. OPSB responded the next month with a letter outlining 31 ways in which the IEE allegedly did not meet Bulletin 1508 criteria. The board invited Seth's parents to have Dr. Brockman contact them to discuss the alleged areas of noncompliance. The parents did not reply to this letter, and there is no indication that Dr. Brockman ever contacted the board. However, Seth's IEE was discussed in an administrative hearing, ongoing at this time, concerning whether Seth was receiving a free appropriate public education.

On December 26, 2012, several months after OPSB sent its objections, Seth's parents sent the board invoices from the IEE totaling $8066.50 and requested reimbursement. The board allegedly did not receive the request until January 31, 2013. On February 28, it denied the request in a letter to Seth's parents, noting that it could not reimburse them for a noncompliant evaluation and that some of the invoices appeared unrelated to the completion of the IEE.

In April 2013, Seth and his parents requested an administrative due process hearing.[6] An ALJ heard preliminary arguments from counsel from both sides. On August 14, 2013, he ruled against Seth and his parents, finding that their counsel had stipulated to the IEE's noncompliance with Bulletin 1508 and that he therefore lacked jurisdiction to award reimbursement.

Seth and his parents sought review in federal district court pursuant to the IDEA.[7] The district court received affidavits, exhibits, and depositions and heard oral argument, but did not allow a full trial on the merits. Rather, on January 20, 2015, it granted summary judgment for OPSB. The court found that the board had not waived its right to challenge Seth's IEE, that the IEE

---

[6] *See* 20 U.S.C. § 1415(f).
[7] *See* 20 U.S.C. § 1415(i)(2).

No. 15-30164

did not comply with Bulletin 1508, and that reimbursement was therefore disallowed.

This appeal followed. The Council of Parent Attorneys and Advocates, Inc., the National Disability Rights Network, the National Federation of the Blind, and the National Association of the Deaf filed amicus briefs urging reversal. The National School Boards Association, the National Association of State Directors of Special Education, and school board associations from Louisiana, Mississippi, and Texas filed an amicus brief urging affirmance.

II

Under 20 U.S.C. § 1415(i)(2)(C), which formed the basis for this action, a district court must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) base "its decision on the preponderance of the evidence" and "grant such relief as the court determines is appropriate." The district court is required to "accord 'due weight' to the hearing officer's findings," but it "must ultimately reach an independent decision based on the preponderance of the evidence."[8] Thus, "the district court's 'review' of a hearing officer's decision is 'virtually de novo.'"[9] Accordingly, in IDEA proceedings, summary judgment "is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."[10]

---

[8] *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) and *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993)).

[9] *Id.* (quoting *Teague*, 999 F.2d at 131).

[10] *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 (E.D.N.Y. 1996); *see Sylvie M. v. Bd. of Educ.*, 48 F.Supp.2d 681, 694 (W.D. Tex. 1999), *aff'd*, 214 F.3d 1351 (5th Cir. 2000) ("The standard of review used by [district] courts reviewing cases under IDEA differs from the traditional summary judgment standard . . . [T]he court reviews the record 'virtually' *de novo*, including the decisions of the state level and independent hearing officers,

No. 15-30164

We have never articulated the standard of review for the appeal of a district court's determination that an IEE does not merit reimbursement. Plainly, however, the district court's inquiry was one of both fact and law, in that the court both interpreted the requirements of federal and state educational regulations and analyzed whether appellants' IEE and the board's conduct conformed to those requirements. "Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate."[11] Here, the validity of the district court's ruling turns in large part on the interpretation of regulatory text. We therefore review the ruling de novo.[12] Within this analysis, however, we review the district court's underlying factual findings for clear error.[13]

## III

We first consider whether OPSB waived its right to refuse reimbursement. Appellants and amici contend that it did, both because the board failed to initiate a hearing to contest Seth's IEE and because it unnecessarily delayed in complying with its duties under IDEA's implementing regulations. We disagree.

*1. Initiation of the due process hearing*

---

and the materials considered in the underlying state administrative proceedings. While according 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence.") (citing *Rowley*, 458 U.S. at 206, and *Michael F.*, 118 F.3d at 252).

[11] *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 569 (5th Cir. 2012) (quoting *Hussaini v. Marine Transp. Lines, Inc.*, 158 F.3d 584 (5th Cir. 1998) (unpublished)); *see also id.* (a mixed question of law and fact "involve[s] legal conclusions based upon factual analysis").

[12] *Cf. Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012) (applying the same standard in reviewing a "district court's decision that a school district failed to provide a FAPE under IDEA").

[13] *Id.*; *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 (5th Cir. 1992).

No. 15-30164

Disputes over IEE reimbursement are governed by an implementing regulation of the IDEA, 34 C.F.R. § 300.502, which reads in relevant part:

> (b) Parent right to evaluation at public expense.
>> […]
>> (2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either—
>>> (i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or
>>> (ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.[14]

In this case, after appellants requested an IEE at public expense, OPSB neither requested a hearing to show that its own evaluation was appropriate, nor did it request a hearing to show that appellants' evaluation failed to meet relevant criteria. Rather, *appellants* requested a hearing on the subject of reimbursement. They now claim that the regulation required OPSB to request a hearing, and that by failing to do so, the board waived its right to refuse reimbursement.

The plain text of the regulation contradicts appellants' reading. § 300.502(b)(2)(ii) excuses an agency from paying for an IEE if the agency simply "*demonstrates* in a hearing . . . that the evaluation obtained by the parent did not meet agency criteria."[15] It does not require the agency to "initiate" or "request" the hearing. In contrast, under (b)(2)(i), the agency must "file" a complaint and "request" a hearing if it wishes to decline reimbursement on the ground that its own evaluation was appropriate. This distinction strongly

---

[14] 34 C.F.R. § 300.502; *see* LA. ADMIN. CODE tit. 28, pt. XLIII, § 503 (2014) (its virtually identical state counterpart).

[15] 34 C.F.R. § 300.502(b)(2)(ii) (emphasis added).

favors reading § 300.502(b)(2)(ii) *not* to require the agency to initiate a hearing.[16]

Appellants and amici refer us to Department of Education commentaries suggesting that § 300.502(b)(2)(ii) gives a school district the duty to initiate a hearing in this context. This contradicts the unambiguous text of the regulation. "If [a] regulation is unambiguous, we may . . . consider agency interpretation, but only according to its persuasive power."[17] The most squarely relevant commentary cited, a 2001 opinion letter, states that if an IEE does not comply with district cost criteria, "[t]he public agency must, without unnecessary delay, initiate a hearing to demonstrate that the evaluation obtained by the parent did not meet the agency's cost criteria." In so opining, however, the Department was responding to school district policies purporting to exercise "sole judgment" over the issue of compliance.[18] Its statement that the districts might be required to "initiate" hearings was incidental to its broader point that they could not legally claim "sole judgment."[19] Perhaps not coincidentally, the letter does not engage in any

---

[16] *See BNSF Ry. Co. v. United States*, 775 F.3d 743, 755 n.86 (5th Cir. 2015) ("[D]ifferent words within the same statute should, if possible, be given different meanings.") (quoting *Firstar Bank, N.A. v. Faul,* 253 F.3d 982, 991 (7th Cir. 2001)).

[17] *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006); *see id.* at 408 n.12 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[18] *Letter to Petska*, 35 IDELR 191 at *2 (U.S. Dep't of Educ., Office of Special Educ. & Rehab. Servs. [hereinafter OSEP] 2001).

[19] *See id.* ("If the total cost of the IEE exceeds the maximum allowable costs and the school district believes that there is no justification for the excess cost, the school district cannot in its sole judgment determine that it will pay only the maximum allowable cost and no further. The public agency must, without unnecessary delay, initiate a hearing to demonstrate that the evaluation obtained by the parent did not meet the agency's cost criteria."). OPSB claims only that it was not required to initiate the review process, not that it has "sole judgment" over the issue of compliance.

detail with the text of § 300.502(b)(2).[20] We find this guidance of questionable value and opt instead to follow the clear text of the regulation itself.

Appellants and amici also cite several out-of-circuit cases in support of their reading of § 300.502(b)(2)(ii). We find these cases unpersuasive. In *Evans v. District No. 17*, the Eighth Circuit required a school district to reimburse parents for the cost of their IEE because the district never "initiated a hearing . . . to show the inappropriateness of the [parents'] evaluation, or to show that its evaluation [was] appropriate."[21] That holding turned on an earlier version of § 300.502(b) that (unlike the current version) did not explicitly contemplate a district's refusal to reimburse for reasons of noncompliance with relevant criteria, or distinguish between such a refusal and a refusal based on the adequacy of the district's own evaluation.[22] The same is true of a subsequent Seventh Circuit case cited by appellants.[23] More recently, in an unpublished

---

[20] *See id.* Another opinion letter cited in the briefs, *Letter to Anonymous*, 22 IDELR 637 (OSEP 1995) (("If a public agency believes the IEE obtained by the parent did not meet its [cost] criteria, it must either initiate a due process hearing or pay for the IEE."), addressed an earlier version of the regulation that (unlike the current version) did not explicitly contemplate a district's refusal to reimburse for reasons of noncompliance with relevant criteria. Petitioners also refer to a comment accompanying the 1999 issuance of revised IDEA regulations, to the effect that school agencies must either initiate a due process hearing or provide an IEE at public expense. *See* Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 Fed. Reg. 12406, 12607 (March 12, 1999). In context, however, this comment appears to be addressing agencies' options when parents *initially request* IEEs. As noted above, although § 300.502(b)(2)(i) plainly requires agencies to either file or pay in that context, the text of the regulation imposes no such requirement when an agency confronts a noncompliant IEE. *See id.* ("The purpose of requiring the public agency to either initiate a due process hearing *if it wishes to challenge a parent's request for an IEE*, or otherwise provide an IEE at public expense, is to require public agencies to respond to IEE requests . . . . There is no corresponding need to specify that a parent also has the right to initiate a due process hearing since if a public agency does not do so it must provide the IEE at public expense.") (emphasis added).

[21] 841 F.2d 824, 830 (8th Cir. 1988).

[22] *See* 34 C.F.R. § 300.503 (1987). The decision cites § 300.505(b), but quotes directly from § 300.503. § 300.505(b) then concerned language requirements for IDEA due process hearing notices and does not appear relevant here.

[23] *Bd. of Educ. v. Ill. State Bd. of Educ.,* 41 F.3d 1162, 1169 (7th Cir. 1994).

opinion, the Eleventh Circuit held without explanation that, because a school board had failed to file a due process request challenging parents' IEE under either § 300.502(b)(2)(i) or § 300.502(b)(2)(ii), the parents were entitled to reimbursement.[24] The decision does not examine the text of the regulation in any detail and appears to elide the clear distinction in the wording of the two clauses at issue. These deficiencies are also present in various lower court decisions cited in the briefs.[25]

In sum, neither the plain text of the regulation nor binding precedent required OPSB to initiate a hearing in order to contest appellants' right to reimbursement. This result conforms with the broader purpose of § 300.502(b), that is, to ensure parents' rights to an IEE at public expense and to due process in the event of a reimbursement dispute. These rights can be vindicated just as well in a hearing initiated by the parents as in one initiated by a school district, as the Sixth Circuit recognized in *P.R. v. Woodmore Local School District*.[26] In that case, the court held that § 300.502(b)(2)(i) was not violated when a school board objected to an IEE by defending the appropriateness of its own evaluation in a due process hearing initiated by the parents. The court reasoned that the "object" of the regulations "is to afford Parents an opportunity to challenge and the School District to defend the appropriateness of its Evaluation in an impartial hearing," which had occurred. It continued:

> As long as the object of the regulations is accomplished, there is no reason to exalt form over substance. Their purpose is not served by holding that there must be reimbursement at public expense when it is the parents rather than the public agency that initiates the due process

---

[24] *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 581 F. App'x 760, 765-66 (11th Cir. 2014) ("The Board did not file a due process request, and it cannot now defend its evaluation or challenge the IEE.").

[25] *See D.H. v. Manheim Twp. Sch. Dist.*, 45 IDELR 38 (E.D. Pa. 2005); *Red Clay Consolidated Sch. Dist.*, 108 LRP 52265 (Del. State Educ. Agency 2005).

[26] 256 F. App'x 751 (6th Cir. 2007) (per curiam).

hearing where the appropriateness of the School District's Evaluation is challenged and confirmed.[27]

The Sixth Circuit's insight applies with even greater force in the context of § 300.502(b)(2)(ii), whose plain text – unlike that of (b)(2)(i) – does not require the agency to initiate a hearing.

*2. Timeliness*

OPSB did not have to initiate a hearing in order to preserve its objection to Seth's IEE. This is not to say, however, that the board could wait indefinitely, forcing appellants to either demand a hearing or forsake reimbursement. Rather, under § 300.502(b)(2)(ii), OPSB had to "demonstrate" the IEE's noncompliance with relevant criteria "without unnecessary delay." We find that OPSB fulfilled this duty.

Appellants sent the board an e-mail on August 25, 2011, stating that "we are requesting an Independent Educational Evaluation for our son Seth . . . . Seth is entitled to receive a comprehensive IEE at public expense." However, the record indicates that appellants did not submit invoices until over a year later. Only then could OPSB know with certainty that appellants sought an IEE *at public expense*[28] – especially since for much of that period, appellants knew of the board's objections to the evaluation, but took no apparent action to address them.[29] We see no reason to penalize OPSB for failing to

---

[27] *Id.* at 755. Indeed, such a holding might force school districts to file duplicative hearing requests (i.e., in cases where parents first requested a hearing) in order to preserve their objections to parents' IEEs. *Cf.* U.S. Dep't of Educ., Office of Special Educ. & Rehab. Servs., Dear Colleague Letter 1, 4 (April 15, 2015), http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/dcl04152015disputeresolution2q2015.pdf (criticizing agencies who file due process complaints after parents already have a pending complaint with a state agency on the same issue).

[28] Parents always have the right to an IEE at private expense. *See* 34 C.F.R. § 300.502(c), (e)(1).

[29] Petitioners claim that they attempted to make the needed corrections during this time, but nothing in the record suggests they apprised OPSB of their efforts. They do not

preemptively seek a hearing on the topic of reimbursement when appellants had not actually requested reimbursement, and when the board had reason to believe they might not. Rather, on these specific facts, the board's delay in "demonstrating" the IEE's noncompliance should be measured from the submission of the invoices.

Appellants' invoices accompanied a letter dated December 26, 2012, which OPSB claims it did not receive until January 31, 2013.[30] Roughly three months later, on April 30, 2013, appellants requested an IDEA due process hearing. From this point, any further delays were a function of the administrative process, not OPSB's sole inaction.[31] Depending on whose records are credited, then, either three or four months passed during which OPSB reasonably could have moved to "demonstrate" the IEE's noncompliance, but did not. We will consider this period in determining whether OPSB acted "without unnecessary delay."

At the outset, we observe that there is little case law or regulatory guidance speaking directly to this question. Appellants and amici cite numerous rulings of lower courts and state agencies, but most of these rulings appear to involve school districts failing to timely respond to parents' *initial requests* for IEEs "without unnecessary delay." Thus, in many of the cited cases, upon receiving a parent's IEE request, the school district took no action—neither granting the request, nor filing for a due process hearing to demonstrate the adequacy of their own evaluation.[32] In others, after receiving

---

seem to have contacted OPSB staff to discuss the deficiencies, as OPSB suggested in its letter outlining those deficiencies.

[30] The district court made no findings as to when the letter was sent or received.

[31] Petitioners do not allege interference or dilatory conduct on OPSB's part.

[32] *See, e.g.*, *Fullerton Sch. Dist.*, 58 IDELR 177 (Cal. State Educ. Agency, Jan. 30, 2012); *Nicole L. v. Brownsville Indep. Sch. Dist.*, 42 IDELR 192 (Tex. State Educ. Agency, Oct. 18, 2004).

an IEE request, the school district waited three months or longer to request a due process hearing to show the adequacy of its own evaluation.[33]

These cases provide limited guidance in the case before us, in which the board delayed not in responding to or challenging parents' initial IEE inquiry, but in contesting their right to reimbursement after the IEE had been completed.[34] When a parent first requests an IEE, the school placement or educational plan for the child may be contingent on the outcome of the IEE.  A months-long delay before even starting the process of holding a due process hearing on the need for an independent evaluation is a significant amount of time when compared to the length of the school year. In contrast, once the IEE has been completed, school officials can consider it immediately before reimbursement issues are resolved. Thus, the IEE's function is not vitiated when only reimbursement is delayed.

To be sure, keeping parents waiting for three or four months before action is taken on reimbursement may be a significant burden, considering the cost of IEEs. But such a delay does not have the same effect (or even any effect) on a child's educational plan as failing to take action on an initial request for an IEE does. Here, any delay by OPSB did not affect whether the IEE could be

---

[33] *See, e.g.*, *Pajaro Valley Unified Sch. Dist. v. J.S.*, No. C 06-0380 PVT, 2006 WL 3734289, at *3 (N.D. Cal. Dec. 15, 2006) (school district waited "almost three months" after IEE request to file for a due process hearing so that it could demonstrate that its own evaluation was appropriate); *L.A. Unified Sch. Dist.*, 48 IDELR 293 (Cal. State Educ. Agency, June 20, 2007) (school district waited three months to request a due process hearing to demonstrate that its evaluation was appropriate); *Bd. Of Educ. of the Monticello Central Sch. Dist.*, 37 IDELR 143 (N.Y. State Educ. Agency, June 4, 2002) (school board waited 20 months after IEE request before initiating a due process hearing on the appropriateness of its own evaluation).

[34] Recall that the board replied eight days after receiving petitioners' initial letter, agreeing to provide the IEE at public expense (contingent on compliance with certain specified criteria) and providing the names of qualified evaluators in the area.

considered in relation to Seth's schooling plan.[35] We also note that during the period at issue, OPSB explained its bases for denying reimbursement in a detailed letter to appellants and urged them to contact the board with any questions. Arguably, this letter was an attempt to informally resolve the dispute.[36] In light of these facts, we conclude that OPSB did not "unnecessar[ily] delay" in "demonstrating" the IEE's noncompliance.

IV

We next consider whether appellants were denied their procedural rights in the district court proceeding. Appellants contend that the district court improperly placed the burden of persuasion on them. The district court reasoned that "the burden of persuasion [should] fall[] where it usually does, on the party seeking relief." Appellants argue that the typical presumption should not apply in IEE reimbursement disputes, since 34 C.F.R. § 300.502(b)(2)(ii) requires the agency, not the parents, to "demonstrate" noncompliance with relevant criteria. However, this requirement applies only to administrative due process hearings.[37] § 300.502(b)(2)(ii) does not purport to govern the appeal of an hearing officer's decision to the federal district court. Rather, such an appeal arises under the IDEA's procedural safeguards provision.[38] As the court below noted, several circuits have interpreted this

---

[35] Indeed, the record suggests that petitioners relied on the IEE at the 2012 administrative hearing concerning whether Seth was receiving FAPE, and that the IEE was extensively discussed in that proceeding.

[36] In its guidance, the Department of Education has exhorted school districts to "strive to resolve [IDEA] disputes informally." U.S. Dep't of Educ., Office of Special Educ. & Rehab. Servs., Dear Colleague Letter 2 (April 15, 2015), http://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/dcl04152015disputeresolution2q2015.pdf.

[37] The requirement for a school district to "demonstrate" non-compliance applies only to hearings made "pursuant to §§ 300.507 through 300.513," all of which outline the procedures for due process hearings before an administrative officer. *See* 34 C.F.R. § 300.502(b)(2)(ii).

[38] *See* 20 U.S.C. § 1415(i)(2)(A) ("Any party aggrieved by the findings and decision made [in an impartial due process hearing] . . . shall have the right to bring a civil action . . .

No. 15-30164

provision to place the burden of persuasion before the district court on the party appealing an IDEA hearing officer's decision.[39] This result conforms to "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims."[40] The district court sensibly followed this default rule, and did not err in allocating appellants the burden of persuasion.

Appellants further argue that the district court erred in refusing to hold an evidentiary hearing with witnesses. Although such a hearing might have been helpful, it was not required in this case. IDEA gives any party aggrieved in a due process hearing "the right to bring a civil action" in a federal district court without regard to the amount in controversy. The district court must both "receive the records of the administrative proceedings" and "hear additional evidence at the request of a party."[41] Whether this latter phrase requires a district court to hold an evidentiary hearing where witnesses testify and are cross-examined is apparently an issue of first impression. Certainly, however, the text itself does not require such a hearing.[42] And the district court did not decide the case on the basis of the administrative record alone. On the contrary, it received additional evidence in the form of exhibits, affidavits, and depositions, and it held oral argument on the motion for summary judgment.

---

which action may be brought in any State court of competent jurisdiction or in a district court of the United States . . . .").

[39] *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012); *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010); *Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 636 (7th Cir. 2010).

[40] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005).

[41] 20 U.S.C. § 1415(i)(2)(C).

[42] Black's Law Dictionary defines a hearing as "[a] judicial session, usu. open to the public, held for the purpose of deciding issues of fact or of law, *sometimes* with witnesses testifying." BLACK'S LAW DICTIONARY 838 (10th ed. 2014) (emphasis added). In the context of administrative law, Black's defines a hearing as "[a]ny setting in which an affected person presents arguments to a decision-maker." *Id.*

14

No. 15-30164

We thus conclude that the district court did not fail to "hear additional evidence."[43]

V

Having determined that OPSB did not waive its right to refuse reimbursement and that the proceedings before the district court were procedurally sound, we approach the crux of this dispute: whether appellants' IEE failed to "meet agency criteria," precluding reimbursement.[44] Before considering whether Seth's IEE complied with Bulletin 1508's criteria, we must determine the criteria relevant to that inquiry. Appellants argue that many of the IEE's 31 alleged nonconformities are illusory because they relate to criteria that were never legally applicable to Seth's IEE in the first place.[45] Their argument has several facets.

First, appellants contend that OPSB may only apply criteria "employed at the initiation of an evaluation," and not "content-based" criteria. They cite 34 C.F.R. § 300.502(e)(1), which provides that "[i]f an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the

---

[43] The ALJ does appear to have erred by failing to hold a due process hearing where the parties could confront and cross-examine witnesses, see 20 U.S.C. § 1415(h)(2), but district courts are permitted to "grant such relief" as they determine appropriate. *See* 20 U.S.C. § 1415(i)(2)(C). Thus, a remand was not necessarily required to address the procedural failing below.

[44] Petitioners argue that they are at least entitled to partial reimbursement for the elements of the IEE that are not implicated in the board's allegations of noncompliance. However, even assuming that compliant elements can be meaningfully defined and isolated from the evaluation as a whole, nothing in the text of 34 C.F.R. § 300.502 invites such a piecemeal approach, nor have petitioners cited relevant authority. Rather, the regulation makes clear that the right to reimbursement pertains to the IEE as a whole, not to its subparts. Therefore, the IEE as a whole must meet agency criteria in order to merit reimbursement.

[45] For the time being, we will consider only the Bulletin 1508 criteria relating to the form, procedures, and content of the evaluation itself. We address OPSB's cost criteria in a subsequent section.

15

examiner, must be the same as the criteria that the public agency uses when it *initiates* an evaluation."[46]

Appellants do not explain how to distinguish "initiation" criteria from "content-based" criteria. Moreover, the phrase "when it [i.e., the agency] initiates an evaluation" could plausibly be understood to identify the evaluations relevant to determining criteria applicable to IEEs, not to limit those criteria. In other words, the regulation can be read to simply subject IEEs (i.e., evaluations initiated by parents) to the same criteria as agencies' own evaluations (i.e., evaluations initiated by agencies). Nonetheless, appellants' reading – that the phrase is language of limitation, not identification – is also plausible as a purely textual matter.[47]

When confronted with ambiguity in regulatory text, we look to agency interpretations.[48] In comments on § 300.502(e), DOE has explained that IEEs must meet substantive requirements applicable to school-conducted evaluations:

> We do not believe it is necessary to add language to the regulations regarding the review of existing data, input from the child's parents, the scope of the evaluation, or the instruments used to evaluate the child, *because an IEE must meet the agency criteria that the public agency uses when it initiates an evaluation . . . .*

---

[46] 34 C.F.R. § 300.502(e)(1) (emphasis added).

[47] Plaintiffs cite *A.S.* ex rel. *S. v. Norwalk Bd. of Educ.*, 183 F. Supp. 2d 534, 551 (D. Conn. 2002), in which a district court held with little analysis that "[t]he plain language of the applicable regulations requires only that a parent's expert meet the same criteria that the Board used when initiating its evaluation, not that the expert employ a methodology approved by the Board." Although not binding, this holding does seem to support petitioners' approach. However, it is unclear from the facts provided in *Norwalk* whether (a) the Board's "methodological" concerns in that case were rooted in Board criteria that were not "initiating" criteria, or (b) whether the Board's "methodological" concerns had no origin in Board criteria of any sort. If the latter, then the statement quoted above need not be read as interpreting the term "initiating." To the extent it does interpret that term to exclude consideration of non-"initiating" criteria, we find it unpersuasive for the reasons described above.

[48] *Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006) ("If [a] regulation is ambiguous, the agency's interpretation . . . is 'controlling unless plainly erroneous or inconsistent with the regulation.'") (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

No. 15-30164

> Similarly, [the IDEA regulations] provide[] that an evaluation conducted by a public agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining whether the child is a child with a disability . . . . *These requirements also apply to an IEE conducted by an independent evaluator, since these requirements will be a part of the agency's criteria.*[49]

This interpretation is consistent with IDEA's underlying purposes.[50] It would seem perverse to enforce non-substantive criteria such as those pertaining to an evaluation's location, but wholly exempt IEEs from substantive criteria concerning, for example, valid assessment strategies and reporting methods. As the Supreme Court has noted, Congress wrote extensive procedural safeguards into IDEA in part to ensure substantively sound educational outcomes.[51] A rule wholly exempting IEEs from substantive criteria would diminish the rigor of the IDEA process, with attendant heightened risk of compromised results. Appellants' "initiation" argument thus fails.

Second, appellants appear to argue that Bulletin 1508's criteria, including those that require a multidisciplinary team, are generally inapplicable to an IEE because that document is oriented toward schools and does not address IEEs in detail.[52] This argument also fails. Under

---

[49] Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,690 (Aug. 14, 2006) (emphasis added).

[50] *Cf. Rose v. Lundy,* 455 U.S. 509, 517 (1982) (ambiguous statutes should be interpreted according to statutory purposes).

[51] *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982) (discussing "the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP").

[52] With regard to the multidisciplinary team requirement specifically, petitioners argue that the use of the singular "examiner" in 34 C.F.R. § 300.502(a)(3)(i), which defines an IEE as "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question," indicates that IEEs need not

§ 300.502(e)(1), IEEs must use the same "criteria that the public agency uses." The public agency in this case, OPSB, uses Bulletin 1508, and the Bulletin therefore applies to the IEE.

Third, appellants claim that only the portions of the IEE relating to their areas of disagreement with the board had to comply with Bulletin 1508 criteria. They invoke DOE guidance allowing an IEE to be limited to the scope of disagreement between parents and an agency. Perhaps, but this guidance does not directly address reimbursement.[53] OPSB cites an August 2011 letter from appellants, in which they stated that "Seth is entitled to receive a comprehensive IEE at public expense," as evidence that they implicitly agreed to be bound by the criteria applicable to all evaluation components. Appellants dispute whether this was really a request for a comprehensive IEE and whether "comprehensive" has any ascertainable legal meaning here. We see no need to wade into this debate. Under 34 C.F.R. § 300.502(b) and (e), a school board has no duty to pay for an IEE demonstrated not to meet agency criteria. Here, appellants claim reimbursement for the entire IEE, so the entire IEE must meet Bulletin 1508's criteria to the extent those criteria are otherwise applicable. This is true whether or not portions of the IEE relate to areas of agreement, and regardless of any intentions the parents may have previously expressed.[54]

---

involve multiple specialists. It is a basic rule of statutory construction that the singular includes the plural. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 130 (2012) (quoting the rules of construction outlined in 1 U.S.C. § 1). Thus, the fact that "examiner" is singular is hardly dispositive.

[53] *Letter to Baus*, 65 IDELR 81 at *2 (OSEP 2015), https://www2.ed.gov/policy /speced/guid/idea/memosdcltrs/acc-14-012562r-baus-iee.pdf.

[54] If petitioners agreed with some elements of the school's evaluation, it would seem more appropriate for them to have not tested those areas in the first place, rather than testing them (allegedly) inadequately and then disputing reimbursement. Petitioners would surely respond that they only tested in areas of agreement because OPSB made them. Yet if their complaint is that the school district required them to have a comprehensive IEE, then they

No. 15-30164

Fourth, appellants claim that Seth's IEE was a reevaluation, not an initial evaluation, and that initial evaluation criteria are therefore inapplicable. Indeed, many of the IEE's 31 alleged nonconformities derive from Bulletin 1508 criteria that apply to initial evaluations.[55] Even assuming the IEE was a reevaluation,[56] we nonetheless find that initial evaluation criteria were applicable. The district court found that appellants suspected Seth had a previously undiagnosed learning disability.[57] Under Bulletin 1508, this required them to comply with initial evaluation criteria.[58]

Fifth, and finally, running through appellants' briefs is the underlying contention that Bulletin 1508 is so onerous as to cumulatively and inherently violate parents' right to an IEE.[59] We cannot agree. The Bulletin 1508 criteria at issue, although extensive, address the quality and thoroughness of evaluations. This is not a case, for example, where agency criteria effectively allow only agency employees to conduct IEEs, constraining parents and undermining the independence of evaluations without necessarily advancing

---

should have disputed this prior to obtaining one. Now that they have, the IEE must comply with applicable criteria to merit reimbursement.

[55] *See* Bulletin 1508 § 513 ("All initial evaluations shall include the following documented components . . .").

[56] *See Letter to Baus*, 65 IDELR 81 at *1 (OSEP 2015), https://www2.ed.gov /policy/speced/guid /idea/memosdcltrs/acc-14-012562r-baus-iee.pdf ("An initial evaluation . . . is the first completed assessment of a child to determine if he or she has a disability under IDEA, and the nature and extent of special education and related services provided. Once a child has been fully evaluated for the first time in a State . . . any subsequent evaluation of a child would constitute a reevaluation.").

[57] Petitioners dispute this factual finding, but we do not find it clearly erroneous in light of the record evidence cited below.

[58] Bulletin 1508's "Reevaluation Procedures" state that "when a different exceptionality is suspected, initial criteria and procedures for the suspected exceptionality shall be followed." Bulletin 1508 § 1105. The Bulletin 1508 "procedures" associated with Seth's suspected additional exceptionality, Specific Learning Disability, incorporate the initial evaluation procedures by reference. *Id.* § 719(C) ("Conduct all procedures described under § 513 [the section pertaining to initial evaluation components].");

[59] *See* 34 C.F.R. § 300.502(e)(1).

the goal of rigor.[60] Allowing parents to ignore Bulletin 1508's criteria can complicate subsequent efforts to compare the IEEs to the districts' own evaluations, undermining a key function of the IEE. Moreover, much of the burden of compliance in this case appears related to appellants' unique circumstances.[61] In light of these circumstances, appellants might have sought to limit the scope of their IEE, and thereby avoid triggering some criteria, before obtaining the evaluation, whether in negotiation with OPSB or in an IDEA due process hearing.[62] Instead, they obtained a lengthy IEE that implicated many Bulletin 1508 criteria. Under § 300.502(b) and (e), the IEE had to meet those criteria to merit reimbursement.

We do not doubt that Bulletin 1508 imposed a heavy burden in this case. Indeed, the record suggests that Seth's parents faced an uphill battle in deciphering its criteria and locating and assembling the requisite evaluators. Despite their diligence and willingness to spend thousands of dollars, they were unable to produce a perfectly compliant IEE. The record also indicates that OPSB – which had a "'natural advantage' in information and expertise" in this context[63] – could have been more helpful in explaining the relevant requirements and processes.[64] Although these facts give us pause, for the

---

[60] *See* Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,689 (Aug. 14, 2006) (forbidding such a policy).

[61] In particular, Seth's family was unwilling to use one of OPSB's two recommended providers because that provider employed Seth's father, requiring a broader search and closing off a potentially inexpensive option closer to home. Petitioners also appear to have suffered unexpected setbacks once they found providers, including one evaluator's unexpected health and administrative problems and another's unwillingness to make needed revisions to the evaluation. Finally, Seth's IEE happens to be subject to extensive initial evaluation criteria because Seth's parents suspected an additional exceptionality.

[62] *See Letter to Baus*, 65 IDELR 81 at *2.

[63] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005) (quoting *School Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 368 (1985)).

[64] Bulletin 1508 consists of 35 dense pages of detailed directives. When OPSB approved Seth's parents' request for an IEE, its employee essentially just sent them a copy of the Bulletin with instructions to stick to it.

reasons we have offered, we cannot conclude that the application of Bulletin 1508 violated the right to an IEE in this specific case.

VI

The Bulletin 1508 criteria implicated in OPSB's 31 alleged areas of noncompliance apply to Seth's IEE. We may therefore consider whether the IEE complies with those criteria. As we have noted, the ALJ below resolved this question against appellants, apparently on the basis of an alleged stipulation as to the IEE's noncompliance. Appellants deny that they so stipulated, and the record is ambiguous as to this point.[65] Nonetheless, in a subsequent filing with the district court, appellants wrote: "Plaintiffs admit that the IEE obtained by them does not contain some elements or components required by Louisiana Bulletin 1508 criteria. Nevertheless, Plaintiffs submit that the information contained in the IEE substantially complies with the Bulletin 1508 criteria."

The district court upheld the ALJ's noncompliance finding. It did not address appellants' argument that the IEE was substantially compliant. Rather, citing the ALJ's finding and OPSB's recital of the 31 alleged areas of noncompliance, it simply held that "the parties agree that the IEE obtained by Plaintiffs does not meet Bulletin 1508 criteria" and that "Plaintiffs are not entitled to reimbursement because the IEE at issue does not comply with Bulletin 1508 criteria."

The degree of compliance necessary for an IEE to "meet agency criteria" under 34 C.F.R. § 300.502 is not explicitly defined in IDEA, its implementing

---

[65] The board alternatively contends that it "demonstrated" the IEE's noncompliance at the 2012 due process hearing between the parties, which preceded the ALJ's ruling. We disagree. The purpose of that hearing was to determine whether Seth was receiving FAPE, not whether the IEE merited reimbursement. Although the IEE appears to have been extensively discussed at the hearing, the record lacks any evidence that the ALJ decided whether the IEE actually met agency criteria. Without such a determination, we cannot say that OPSB "demonstrated" the IEE's deficiency in 2012.

regulations, or the case law, nor is there any directly relevant agency guidance. Yet standards akin to substantial compliance are already deployed in other IDEA contexts.[66] For example, we consider substantial compliance in determining whether school districts have provided education "in conformity with" students' individualized education programs (IEPs), as IDEA requires.[67]

We are persuaded that substantial compliance also suffices in the IEE context. 34 C.F.R. § 300.502 nowhere demands perfect adherence to agency criteria.[68] Indeed, such a requirement is in tension with core purposes of the right to an IEE and of the IDEA generally.

As the Supreme Court has emphasized, IDEA's procedural safeguards, including the right to an IEE, are essential to the statutory scheme.[69] Through them, Congress sought to "giv[e] parents and guardians a large measure of

[66] *See, e.g.*, *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) ("'Procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity.'") (quoting *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001)).

[67] *See* 20 U.S.C. § 1401(9)(D); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346, 349 (5th Cir. 2000) ("[A] party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP."); *see also Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 975 (6th Cir. 2012); *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH,* 642 F.3d 478, 484 (4th Cir. 2011); *A.P. v. Woodstock Bd. of Educ.*, 370 F. App'x 202, 205 (2d Cir. 2010); *Fisher ex rel. T.C. v. Stafford Twp. Bd. of Educ.,* 289 F. App'x 520, 524 (3d Cir. 2008); *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811, 821 (9th Cir. 2007); *Neosho R–V Sch. Dist v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003).

[68] According to Merriam-Webster, "meet" (as in "meet agency criteria") can refer to either substantial or strict conformity, although it more often denotes the latter. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 723 (10th ed. 1996) (defining "meet" as "to conform to esp. with exactitude and precision"); *id.* at 242 (defining "conform" as "to be similar or identical"). *See also Van Duyn*, 502 F.3d at 821 (statutory language requiring "special education and related services" to be provided "in conformity with" an IEP does not impose a textual "requirement of perfect adherence to the IEP") (citing 20 U.S.C. § 1401(9)).

[69] *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982) ("When [IDEA's] elaborate and highly specific procedural safeguards . . . are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.").

No. 15-30164

participation at every stage of the administrative process,"[70] and to ensure that the process produced substantively sound results.[71] The right to an IEE at public expense serves these purposes, both because it enables parents to genuinely and consequentially take part in the IDEA process and because it allows them to introduce additional and different data into that process, informing its ultimate outcomes.[72]

A substantial compliance standard for IEE reimbursement also advances these purposes. First, it safeguards parents' ability to participate in the IDEA process through IEEs by preserving a realistic possibility of reimbursement. The state criteria that govern IDEA evaluations can be complex. Given this, and given their "natural advantage in information and expertise" in this context,[73] school agencies may be able to find ambiguities or inconsequential nonconformities in any IEE. If they are allowed to deny reimbursement in turn, they will effectively be able to treat parents' right to an IEE as a privilege to be granted at their discretion, since few parents can afford to spend thousands of dollars out of pocket on an evaluation. Second, by ensuring reimbursement for generally sound IEEs that may happen to be deficient in isolated or trivial ways, a substantial compliance standard will encourage parents who might not otherwise have obtained and submitted IEEs to do so, leading to better-informed IDEA outcomes.

---

[70] *Id.* at 205.

[71] *See id.* at 206 (discussing "the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP").

[72] *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 61 (2005) (by virtue of their right to an IEE at public expense, parents "are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.").

[73] *Id.* at 60 (quoting *School Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 368 (1985)).

No. 15-30164

The board worries that "[i]f this Court were to adopt the Plaintiffs' implicit criterion of "substantial" compliance . . . . [b]ased on an unreasonably low standard, presumptively a couple of paragraphs–or even a prescription pad with 'OHI,' 'Autism,' or 'SLD' with little more–would suffice as an IEE." Although the slippery slope is always a concern when the law accepts less-than-perfect compliance,[74] we find the risk acceptable here, given the strong statutory interests favoring a substantial compliance standard and the use of such standards elsewhere in the IDEA case law. We do not suggest that "a couple of paragraphs" or a "prescription pad" notation will now pass muster. Indeed, the determination will necessarily turn on the particular facts and agency criteria at issue in each case. "Substantial compliance," allowing reimbursement in this context, means that insignificant or trivial deviations from the letter of agency criteria may be acceptable as long as there is substantive compliance with all material provisions of the agency criteria and the IEE provides detailed, rigorously produced and accessibly presented data.

In so holding, we are mindful of our limited expertise.[75] To be sure, a substantial compliance standard presumes that adjudicators can reliably identify which deviations are "substantial," requiring some engagement with substantive questions of special education practice. Yet this is nothing new. IDEA already requires district courts to review the factual findings of administrative hearing officers "virtually de novo."[76] In turn, they must "reach . . . independent conclusion[s] based upon the preponderance of the evidence"[77]

---

[74] *See, e.g.*, *United States v. Locke*, 471 U.S. 84, 101 (1985) (discussing filing deadlines).
[75] *Cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973) ("[T]his Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels" concerning "the most persistent and difficult questions of educational policy . . . .").
[76] *See Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993) (adopting this interpretation and citing cases).
[77] *Id.*

24

as to such questions as whether students require more or less restrictive learning environments,[78] whether IEPs are "reasonably calculated to enable [children] to receive educational benefits,"[79] and whether schools' failures in implementing IEPs implicate "significant provisions of . . . IEP[s]" or are instead "de minimis."[80] Seeing "substantial compliance" as a comfortable fit within a regimen constructed to promote exchange and cooperative engagement for the benefit of student and school, we doubt applying a substantial compliance standard to IEEs will pose a greater challenge, or stretch courts' role farther than the statute itself contemplates.

VII

Seth's IEE will "meet agency criteria" and merit reimbursement if it substantially complies with Bulletin 1508. As noted above, the district court did not squarely address this factually specific question. We therefore remand for analysis under a substantial compliance standard. If the court below (or, upon further remand, the administrative hearing officer) finds the IEE substantially compliant, it should award reimbursement.

In any event, however, appellants will not be entitled to the full cost of the evaluation they obtained. Appellants knew of OPSB's $3,000 cost cap for IEEs, yet they spent over $8,000. The Department of Education has explained that IDEA allows schools to enforce reasonable cost criteria for IEEs as long as parents in unique circumstances have the opportunity to request exemption.[81] Here, OPSB offered appellants an opportunity to demonstrate unique

---

[78] *Id.* at 132-33.

[79] *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *see, e.g.*, *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1011 (5th Cir. 2010).

[80] *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 348-49 (5th Cir. 2000).

[81] Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46689-90.

circumstances in its correspondence with them over the cost cap, but appellants did not respond. Therefore, the $3,000 cap binds them.[82]

We VACATE and REMAND to the district court for further proceedings consistent with this opinion.

---

[82] Petitioners also object to having been required to pay the cost of the IEE upfront. However, as DOE has explained, "The IDEA does not address whether funding should be paid as reimbursement or as a cash advance. If the parent requests advance funding for IEE-related expenses and the public agency denies that request, the parent could request a due process hearing . . . if the parent believes that denial of advance funding would effectively deny the parent the right to a publicly-funded IEE." *Letter to Petska*, 35 IDELR 191 at *2 (OSEP 2001). Petitioners made no such request. Furthermore, OPSB offered petitioners the opportunity to demonstrate unique circumstances that would justify the board's paying directly for the IEE, but petitioners did not respond.

No. 15-30164

JERRY E. SMITH, Circuit Judge, dissenting.

The majority's creation—from whole cloth—of a substantial-compliance standard in Part VI is a dramatic judicial amendment of the Individuals with Disabilities Education Act ("IDEA") without textual or precedential justification. It is both a usurpation of regulatory authority and an invitation for courts to engage in arbitrary decisionmaking. And, the majority provides scant direction on what substantial compliance really means. I respectfully dissent.

## I.

Though my colleagues observe that this court has used a substantial-compliance standard in other applications of the IDEA, those cases involved a distinct statutory basis. All of the cases cited by the majority relate to whether a school's alleged failure to develop or implement an individualized education plan ("IEP") deprived students of a free and appropriate public education ("FAPE").[1] That is an inquiry considerably different from whether an independent educational evaluation ("IEE") complies with state criteria.

Title 34 C.F.R. § 300.502(e)(1) has a plain textual mandate: The criteria under which an IEE is obtained at public expense "*must be the same* as the criteria that the public agency uses when it initiates an evaluation." (Emphasis added.) And if the agency (the school) demonstrates that "the evaluation obtained by the parent did *not meet* agency criteria," it need not pay for it. 34 C.F.R. § 300.502(b)(2)(ii) (emphasis added). There is no qualifying language

---

[1] *See Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811–12 (5th Cir. 2003); *Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346, 349 (5th Cir. 2000); *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 975 (6th Cir. 2012); *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH,* 642 F.3d 478, 484 (4th Cir. 2011); *A.P. v. Woodstock Bd. of Educ.*, 370 F. Ap'x 202, 205 (2d Cir. 2010); *Fisher ex rel. T.C. v. Stafford Twp. Bd. of Educ.,* 289 F. App'x 520, 524 (3d Cir. 2008); *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J,* 502 F.3d 811, 821–22 (9th Cir. 2007); *Neosho R–V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003); *T.S. v. Indep. Sch. Dist. No. 54,* 265 F.3d 1090, 1095 (10th Cir. 2001).

such as "substantially" or "mostly."

In contrast, where courts have applied a "substantial compliance" standard to determine whether a school denied a student a FAPE in its development of or implementation of an IEP, the IDEA is less specific. "It is well-settled that, without a claim that the FAPE was deficient, procedural defects are not actionable." *T.S.*, 265 F.3d at 1095*; see also Adam J.*, 328 F.3d at 812 & n.23 (adopting the approach in *T.S.*). Thus, to assert that a school failed to follow IDEA regulations regarding an IEP, the claimant must make an overall allegation that a FAPE itself was denied.

The IDEA does not prescribe substantive standards for what constitutes a FAPE. As explained in *Board of Education v. Rowley*, 458 U.S. 176, 205 (1982),[2] the IDEA provides a number of "highly specific procedural safeguards" but "general and somewhat imprecise substantive admonitions." "Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* at 189. There must be a "lost educational opportunity" for there to be a FAPE violation. *See Adam J.*, 328 F.3d at 812.

Procedural defects alone do not necessarily result in lost educational opportunities. Therefore, given the lack of guidance in the IDEA regarding the substance of a FAPE, and, thus, what an IEP is supposed to achieve, it is not surprising that *in that context* courts employ a "substantial-compliance" standard and excuse minimal procedural violations. *See, e.g., id.*[3] The requirement

---

[2] *Rowley* is the case often cited by courts in discussing the substantial-compliance standard. *See, e.g., Bobby R.*, 200 F.3d at 346, 349; *Van Duyn*, 502 F.3d at 821–22; *Clark*, 315 F.3d at 1027 & n.3.

[3] Although determining whether a FAPE has been provided is a completely different inquiry from determining whether an IEE is eligible for public reimbursement, 20 U.S.C. § 1401(9)(D) does explain that a FAPE is "provided in conformity with the [IEP]." Thus, there is some textual basis for requiring schools, in order to provide a FAPE, to comply with *all* of

that, to be reimbursed at public expense, an IEE must meet the same standards as for school-initiated evaluations does not bear, however, on the substantive question of what constitutes a FAPE.

Instead, there is good reason for schools to be required to pay only for those IEEs that fully comply with state evaluation criteria, as the majority comes close to acknowledging.[4] Regardless of who is paying, schools must consider an IEE in their educational determinations only "if it meets agency criteria." 34 C.F.R. § 300.502(c)(1). Because school-conducted evaluations must meet federal criteria,[5] it is not surprising that IEEs that do not meet those same criteria are not particularly helpful to the schools. Requiring a school to pay for an evaluation that it need not consider drains scarce resources from other programs.

## II.

The majority's decision to apply a "substantial-compliance" standard is in tension with its earlier holding, in the last portion of Part V, that the IEE must comply with Bulletin 1508's criteria. Implicit in the parents' claim that they need only "substantially comply" with Bulletin 1508's requirements is a contention that they can flout (or fail to comply with) *some of* Bulletin 1508's criteria. Yet, if parents can ignore some of the criteria, to what extent do they need to comply with Bulletin 1508 at all?

---

the procedural requirements governing IEPs. Some of the critiques I make here of a substantial-compliance standard for IEE reimbursements could apply to a substantial-compliance standard in the context of FAPE violations. Yet, though the substantial-compliance standard for FAPE violations is the established rule in this circuit, see *Adam J.*, 328 F.3d at 812, there is no Fifth Circuit precedent on the requirements for IEE reimbursement.

[4] "Allowing parents to ignore Bulletin 1508's criteria can complicate subsequent efforts to compare the IEEs to the districts' own evaluations, undermining a key function of the IEE."

[5] *See, e.g.*, 34 C.F.R. § 300.304(b)–(c) (outlining requirements for school-conducted evaluations).

The majority provides meager guidance to the district courts on what "substantial compliance" looks like in the context of IEE reimbursement. Is meeting six out of ten criteria enough, or does it matter what kind of criteria are at issue? According to my colleagues, "[s]ubstantial compliance . . . means that insignificant or trivial deviations from the letter of agency criteria may be acceptable as long as there is substantive compliance with all material provisions of the agency criteria . . . ."

That definition collapses on itself. Substantial compliance is "substantive compliance." What is material and what is insignificant? The majority offers little indication. Instead, this so-called "standard" asks judges to act as policymakers to determine which agency criteria are and are not important.

Apparently, "substantial compliance" also requires the IEE to "provide[] detailed, rigorously produced and accessibly presented data." Yet, data can be detailed, rigorously produced, and accessibly presented and still not be useful if it measures the wrong types of abilities. Thorough methodology does not compensate for categorical errors. That part of the definition is also unhelpful.

At this point, there is no way to know what constitutes substantial compliance; instead, that term sends a nod to district courts that "you will know it when you see it." That is a standardless and, for the most part, useless pronouncement that lends itself to abuse. In contrast, a bright-line rule, requiring an IEE to comply with all agency criteria in order to be reimbursed, is much easier to administer and removes boundless discretion from the district courts.

### III.

The school board articulated thirty-one ways in which Seth's IEE failed to comply with state criteria, in addition to its failure to adhere to the cost cap. Contrary to the majority's characterization of the district court's decision, the district court grouped those thirty-one allegations into four groups and

analyzed each one to find non-compliance.[6]  Notably, on appeal the parents do not combat these findings by demonstrating that the IEE actually adhered to Bulletin 1508;[7] instead, they advance the notion that the IEE need not comply with all of Bulletin 1508.  Given the majority's holding that the IEE was required to comply with it, and the parents' failure to demonstrate such compliance, this should have been an easy case.

This conclusion is further strengthened if we look beyond the arguments and examine the record submitted to the district court.[8]  Even assuming that some of the thirty-one areas of non-compliance were mere formatting deficiencies, as the parents imply,[9] there are also significant missing components from the IEE.  Many of those missing elements relate to how Seth's impairments should be addressed in a school setting.

---

[6] According to the majority, the district court "simply held . . . that 'Plaintiffs are not entitled to reimbursement because the IEE at issue does not comply with Bulletin 1508 criteria.'"  Thus, the majority implies that the court accepted the school board's allegations without conducting further analysis.  That is a mischaracterization of the opinion, whose entire sentence reads, "Plaintiffs are not entitled to reimbursement because the IEE at issue does not comply with Bulletin 1508 criteria *with respect to the four areas of testing above.*" (Emphasis added.)  Though the district court's analysis was somewhat limited, it did address each of these four areas of non-compliance.

[7] Indeed, the parents earlier admitted that the IEE did "not contain some elements or components required by Bulletin 1508 criteria."  Nevertheless, the parents briefly did reference a chart submitted to the district court in which they disputed the thirty-one counts of non-compliance.  Yet they did not elaborate on those arguments in their submissions before us.  Failure adequately to brief an issue on appeal is waiver.  *See* FED. R. APP. P. 28(a)(8)(A); *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992).

[8] Absent adequate argumentation in a brief, we are not required to comb through the record to look for points presented in the district court.  *Beaumont*, 972 F.2d at 563.  Nonetheless, I have conducted additional, albeit limited, analysis of the thirty-one areas of alleged non-compliance, and my findings are summarized above.

[9] The parents contend that any failure to follow Bulletin 1508 was inconsequential.  Thus, although acknowledging that the IEE was missing some components, they contended that the IEE "substantially" complied with Bulletin 1508's criteria.  It is true that some of the thirty-one areas of non-compliance appear less significant and probably would have been easy to correct.  For example, the IEE did not provide Seth's achievement scores using chronological age norms; instead, it used grade-based norms.  Nevertheless, even though the school board offered to provide guidance to help the parents bring the IEE into full compliance, the parents failed to do so.

For example, the IEE did not contain a description of Seth's educational needs in prioritized order.[10]  Similarly, the IEE did not contain an assessment, conducted at school, of Seth's gross motor abilities to evaluate the extent to which they affected his ability to participate in educational activities.[11]  Perhaps most significantly, the IEE did not evaluate or review the extent to which existing interventions[12] were working.[13]

Although the IEE contained plenty of data regarding Seth's overall abilities, and it did make recommendations for future improvement, there was little analysis of past performance and accommodations.  The effectiveness of current and prior learning strategies, however, is an important data point in planning future interventions.  Therefore, even if some of the areas of non-compliance were minor, there is no doubt that the IEE failed to comply with Bulletin 1508 in significant ways.  Thus, even if we purport to apply a substantial-compliance standard, the IEE is fatally non-compliant.

---

[10] In the district court, the parents noted that the school board had not included a prioritized list of educational needs in its previous evaluations.  Even if the parents are correct, "two wrongs don't make a right."  Bulletin 1508 states that a prioritized list is required.  *See* Bulletin 1508, LA. ADMIN. CODE tit. 28, pt. CI at § 513(B)(1)(g) (2009).  Indeed, if the school did fail to include such a list in prior evaluations, there was even more reason for the IEE to include it, because IEEs frequently are designed to supplement school-board assessments.

[11] The physical-therapy evaluation did assess Seth's overall gross motor skills, as the parents note, but there is no indication that the physical therapist evaluated Seth in an educational environment, as Bulletin 1508 requires.  *See* LA. ADMIN. CODE tit. 28, pt. CI § 1507(C)(1)(b)(i).

[12] Interventions are learning strategies that are tailored to individual students' specific needs.  *See, e.g.*, Bulletin 1508, LA. ADMIN. CODE tit. 28, pt. CI, § 301.  Bulletin 1508 requires evaluations to contain an analysis of existing interventions.  *See id.* § 513(B)(1)(c).

[13] The IEE states that documentation of evidence-based interventions was not provided as part of Seth's educational records.  Nevertheless, the IEE later refers to teachers who mentioned interventions and to accommodations that were based on a 2010 evaluation of Seth conducted by the school, so its failure to analyze at least these interventions more fully is inexplicable.  The IEE also mentions IEP progress reports, so its earlier statement that there was no documentation from the school regarding Seth's performance is contradictory.

IV.

The majority contends that absent a substantial-compliance standard, schools will treat IEE reimbursement "as a privilege to be granted at their discretion" and thus effectively deny parents' right to an IEE, undermining the purposes of the Act.[14] Yet, if the majority is concerned that school districts will employ arcane criteria and exacting formatting requirements to avoid paying for IEEs, there is already a mechanism built into the regulation to protect against such impositions. Section 300.502(e)(1) requires an IEE to follow the same criteria that the school uses to conduct its evaluations "to the extent those criteria are consistent with the parent's right to an [IEE]." If the school's criteria effectively prohibit parents from ever having an IEE conducted at public expense, parents are entitled to bring a due-process hearing to challenge these criteria. *See* 34 C.F.R. § 300.507(a)(1) (2015). If such criteria are inappropriately burdensome or irrelevant to parents, the proper approach is to strike down the criteria, holding that parents need not comply with them, rather than holding that the criteria *do* apply but parents need to comply with them only "substantially."

In this court, the parents challenge some of the requirements in Bulletin 1508 as infringing their right to an IEE, including the imposition of content-based criteria, the necessity of a multidisciplinary team, and applying the criteria for initial evaluations as opposed to reevaluation criteria.[15] The majority concludes that the application of all of these criteria was appropriate. Because the majority determines that Bulletin 1508 is not "so onerous as to cumulatively and inherently violate parents' right to an IEE," application of the criteria in the bulletin cannot infringe on the parents' right to an IEE.

---

[14] The majority's reliance on purposivism is misguided. *See infra* Part V.

[15] Though the parents challenged the application of more specific criteria in the district court, they do not press those challenges before us, so they are waived.

No. 15-30164

Thus, there is no need for the majority to spin a substantial-compliance standard to protect from the supposedly intrusive application of Bulletin 1508.

V.

The majority's decision to impose a judge-made standard on IEE reimbursements is deeply flawed. The majority cites not one single word in the IDEA or its accompanying regulations that points to the existence of a substantial-compliance standard for IEE reimbursement.[16] Instead, the majority looks broadly to the purported purposes of the IDEA to discover a heretofore hidden substantial-compliance standard.[17] Such purposivism is but another name for license to refashion a statute or regulation to suit the judge's personal whims.

That is not to say that purpose is irrelevant, but it is operationalized *via* the text. *See* SCALIA & GARNER, *supra*, at 20 (explaining that textualism "routinely takes purpose into account, but in its concrete manifestations as deduced from a close reading of the text"). The danger arises when purpose is disembodied from the text. Indeed, "[t]he most destructive (and most alluring)

---

[16] Indeed, the majority observes, "The degree of compliance necessary for an IEE to 'meet agency criteria' under 34 C.F.R. § 300.502 is not explicitly defined in IDEA, its implementing regulations, or the case law, nor is there any directly relevant agency guidance."

[17] The majority's flawed approach is encapsulated in its footnote urging us to interpret ambiguous statutes according to their purpose. This misses the point that in regard to whether IEEs must meet all agency criteria, there is no ambiguity. In the absence of language to the contrary, the plain implication of the text is that IEEs need to comply fully with local regulatory requirements. The regulatory drafters did not say that IEEs "may be required" to comply with agency criteria; instead they stated that IEEs "must" comply. 34 C.F.R. § 300.502(e)(1); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112–15 (2012) (explaining that "[m]andatory words," such as "must" "impose a duty," and "permissive words grant discretion").

Thus, by the majority's own reasoning there is no need to surmise regulatory purpose, because there is no ambiguity. Even if there were, the proper approach would be to use the various textual canons of statutory interpretation to resolve any textual uncertainties. *See, e.g., POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014) (applying textual canons and explaining that "[a]nalysis of the statutory text, aided by established principles of interpretation, controls").

feature of purposivism is its pure manipulability." *Id.* at 112–15. "Any provision of law or of private ordering can be said to have a number of purposes, which can be placed on a ladder of abstraction." *Id.* Law then becomes whatever the judges wish it to be.

The majority opinion not only serves as an example of such personal-preference decisionmaking but also provides little direction to district courts on how its new extra-textual standard operates. Instead, the majority invites the district judges to engage in the same sort of judicial arbitrariness, as they apply their own notions to decide what is and is not substantially compliant. Not only is such purposivism inappropriate, it is unnecessary. As I have explained, if the concern is that parents will be prohibited from obtaining IEEs, the regulations already provide an avenue for them to challenge the imposition of overly burdensome criteria.

Judges must resist the siren call to become lawmakers. I respectfully dissent.