# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 15, 2019

Lyle W. Cayce
Clerk

No. 18-50160

———————

LISA M., as parents/guardians/next friends of J.M., a minor individual with a disability; KENNETH M., as parents/guardians/next friends of J.M., a minor individual with a disability,

Plaintiffs - Appellees

v.

LEANDER INDEPENDENT SCHOOL DISTRICT,

Defendant - Appellant

———————

Appeal from the United States District Court
for the Western District of Texas

———————

Before KING, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

When J.M. started fourth grade, his parents asked Leander Independent School District to evaluate him for special education. The District spent weeks analyzing J.M.'s educational profile and determined that he needed special education. Shortly afterwards, following a private staff meeting, the District changed its position. J.M.'s parents pursued administrative relief. A Special Education Hearing Officer found that the school district was right the first time. On appeal, in a comprehensive opinion, the district court also concluded that J.M. was eligible for special education. We affirm.

No. 18-50160

## BACKGROUND[1]

### Kindergarten Through Beginning of Fourth Grade

When J.M. was in second grade at Ronald Reagan Elementary School in the Leander Independent School District (the "District"), he experienced challenges with writing and classroom behavior. The District provided accommodations through Section 504 of the Rehabilitation Act ("Section 504"). By April of second grade, J.M. had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Developmental Coordination Disorder ("DCD"). For the following year and a half, J.M.'s parents did not request services beyond Section 504.

Shortly before the start of J.M.'s fourth grade year, in August 2015, J.M.'s parents requested that J.M. be evaluated for special education and related services under the Individuals with Disabilities Education Act ("IDEA"). The District refused on the basis that J.M.'s Section 504 accommodations were sufficiently addressing his needs.[2]

One month later, a private neuropsychologist recommended that J.M. be considered for special education and diagnosed him with a Specific Learning Disability ("SLD") with impairment in written expression. After that, the District agreed to evaluate him.

### IDEA Evaluation Procedures, Generally

Under the IDEA, a school district "shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1)(A). This evaluation is called the "Full and Individual Evaluation," or "FIE." The FIE

---

[1] The following facts are undisputed unless otherwise specified.

[2] The IDEA and Section 504 share a complex relationship. "In short, the IDEA guarantees individually tailored educational services, while [Section 504] promise[s] non-discriminatory access to public institutions." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017). But there is "overlap in coverage." *Id.*

must consist of procedures "to determine whether a child is a child with a disability [as defined by the IDEA]" and "to determine the educational needs of such child." 20 U.S.C. § 1414(a)(1)(C). Each of those determinations is crucial because eligibility for IDEA services is a two-pronged inquiry: (1) whether the child has a qualifying disability, and (2) whether, by reason of that disability, that child needs IDEA services. 20 U.S.C. §§ 1401(3), 1414(d)(2)(A).[3]

When "appropriate," as part of the FIE, the school district is required to perform a "[r]eview of existing evaluation data" ("REED"). 20 U.S.C. § 1414(c)(1). The REED must include "evaluations and information provided by the parents," "current classroom-based, local, or State assessments, and classroom-based observations," and "observations by teachers and related services providers." *Id.*

"Upon completion of the administration of assessments and other evaluation measures[,] the determination of whether the child is a child with a disability . . . and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child." 20 U.S.C. § 1414(b)(4). Texas, by statute, has named that team the "admission, review, and dismissal," or "ARD" committee. 19 Tex. Admin. Code § 89.1040(b). In making its eligibility determination, the ARD committee must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior." 34 C.F.R. § 300.306(c)(1)(i).

---

[3] There is a relevant sub-prong under the first prong. A "qualifying disability" (first prong) is defined to include an "other health impairment" ("OHI"), which is defined to include ADHD. Regulations elaborate that an OHI (such as ADHD) must not only be diagnosed, but also must "adversely affect[] a child's educational performance." 34 C.F.R. § 300.8(c). The District concedes that J.M.'s OHI did so.

No. 18-50160

"If a determination is made that a child has a disability and needs special education and related services, an [individualized education program] must be developed for the child." *Id.* § 300.306(c)(2); *see also* 20 U.S.C. § 1414(d)(2)(A). The "individualized education program" ("IEP") is a "written statement" that outlines how special education and related services will be delivered to the child. 20 U.S.C. § 1414(d)(1)(A). The school district's mandate to design and deliver an IEP falls under its broader statutory obligation to furnish a "free appropriate public education" ("FAPE") to all IDEA-eligible students. 20 U.S.C. § 1412(a)(1); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) (describing an IEP as the "primary vehicle" for implementing a FAPE).

If a parent is dissatisfied with a school district's "evaluation or educational placement" of a child, the parent "may file a due process complaint." 34 C.F.R. § 300.507(a). An informal resolution meeting must follow. 34 C.F.R. § 300.510-512. If disagreement persists, complainants may pursue relief in an administrative due process hearing before an impartial Special Education Hearing Officer ("SEHO"). 34 C.F.R. § 300.510-512. Appeals may be taken to federal district court. 34 C.F.R. § 300.516.

### J.M.'s Initial Evaluation

Those basic steps were followed in this case. In October 2015, the District scheduled a REED meeting and advised J.M.'s parents that the District was considering an FIE. At the same time, the District implemented a "response to intervention process" ("RTI"), which is a general—not special—education methodology that offers tiers of progressively intensified support depending on a student's response to instruction. *See* Genna Steinberg, *Amending § 1415 of the IDEA: Extending Procedural Safeguards to Response-to-Intervention Students*, 46 Colum. J.L. & Soc. Probs. 393, 395 (2013).[4]

---

[4] The United States Office of Special Education Programs ("OSEP") has clarified that "RTI strategies cannot be used to delay or deny the provision of an [FIE]." Memorandum from

No. 18-50160

The District formally issued a REED for J.M. on the same day the REED meeting was held: October 9, 2015. In the REED report, one of J.M.'s teachers commented that he was a "rock star," "very bright," and "fun to watch and teach." But the REED also documented a teacher's observation that J.M.'s "fine motor skills" were at the "lower end of average" and that even when J.M. took his ADHD medication, his ability to "[maintain] an organized notebook" was "significantly below his peers." Teachers also expressed concern that J.M. had: "difficulty producing written work, poor attention and concentration, excessively high/low activity level, difficulty following directions, [and] difficulty staying on task." Furthermore, the REED reported parental observations that J.M. was "flipping numbers and letters" and that he was having "melt downs" when feeling overwhelmed. The REED concluded that J.M. "appear[ed] to have one or more conditions which directly affect[ed] [his] ability to benefit from the educational process." It advised that "[a]dditional data [were] needed to determine whether the student [needed] special education and related services."

On the same day the REED was issued, the District sought consent from J.M.'s parents to undertake an FIE. The consent form explained, "We want to do a Full and Individual Evaluation of your [child] for the following [reason]: [T]he [RTI] team noted that while [J.M.] has made some progress with these interventions in place, he had not progressed at an expected rate." The form noted that the District rejected the option of continuing general education interventions because J.M. "continu[ed] to struggle." J.M.'s parents consented to the FIE.

On November 18, 2015, the District convened another REED meeting. The notes from that meeting reflect "[t]eacher and parent concerns" with

Melody Musgrove, Director, OSEP, to the State Directors of Special Education (Jan. 21, 2011), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep11-07rtimemo.pdf.

respect to "written expression." The notes also state that J.M.'s "work habits" had "change[d]" insofar as he was "not completing work" and making "errors he typically did not make." J.M.'s mother described how J.M. was "distressed about the writing demands at school" and that he "beg[ged] to stay home" from school due to stomach pain. This REED updated the October REED by adding that J.M. should undergo an emotional and behavioral evaluation.

The District completed its FIE on January 4, 2016. The report outlined J.M.'s talents and difficulties, which the District has characterized as a "varied academic profile." J.M. was reported to have "average or near average abilities in the areas of Basic Reading, Reading Fluency, Reading Comprehension, Math Calculation, Math Reasoning, Oral Expression, and Listening Comprehension" but "apparent deficits in Written Expression." The FIE also explained that J.M. "display[ed] a tendency toward inattentiveness to a significant degree across all settings." The FIE concluded with a section called "Recommendations to the ARD Committee." That section included a finding that J.M. met eligibility criteria for IDEA services as a student with an SLD in the area of written expression and with the "Other Health Impairment" ("OHI") of ADHD. Finally, the FIE included a few specific recommendations for the IEP.

On January 16, 2016, J.M.'s parents received an email introduction from Amy Stringer, who explained, "I will be [J.M.]'s tracking teacher in special education." She referenced "paperwork coming home with [J.M.]" that included a draft IEP. The draft IEP proposed "20 minutes per day per 5 day week" of special education instruction in writing as well as the related service of occupational therapy.

**ARD Committee Meetings and Eligibility Determinations**

Nine days later, the District held J.M.'s first ARD committee meeting. The team discussed concerns with J.M.'s academics. By that point, he had

failed all his December 2015 benchmark tests, scoring 57% on math, 45% on reading, and 30% on writing. His teachers described these scores as "extreme" and "shock[ing]." One of J.M.'s teachers later testified that she was "very surprised" by his benchmark performance because the results were "much, much lower than . . . what we see as his ability in the class." The team also discussed J.M.'s strengths, noting that even some of his writing scores were "not uncommon" for fourth graders and that his disruptive and unfocused behaviors were often "re-directable."

After approximately three and a half hours of discussion, the ARD committee formalized its determination that J.M. was eligible for special education. The committee memorialized its agreement in a document titled "Individualized Education Program (IEP)," which certified that J.M. met the criteria for OHI and SLD and, "by reason of those disabilities," had a "need for special education and related services." The document stated, "No [a]dditional evaluation is needed."

The "IEP" document also delineated a "Schedule of Services" for J.M., which were proposed to take effect the following day and continue for one calendar year. The "Schedule of Services" increased the amount of specialized assistance from the draft IEP's twenty minutes per day to thirty minutes per day. It added assistive technology as a related service additional to occupational therapy. At the end of the ARD committee meeting, J.M.'s mother, Lisa M., declined to sign the "Schedule of Services" because she wanted to discuss its details with her husband, who had been unable to attend.

J.M.'s parents and the District offer conflicting interpretations of what happened next, but the following facts are undisputed.

The District's minutes of the January 25 meeting ended with the following notes: "Assurances given. Parents/district agree with IEP," "Another

meeting was scheduled for Feb. 5 . . . if needed," "Parents/district adjourned in agreement."

On February 3, 2016, Lisa M. sent an email to the District stating:

> After reviewing the FIE and the IEP for [J.M.], we have decided to disagree with both. We do agree to the initiation of Special Education services and the eligibility of OHI and SLD ([just not] to the quality/quantity of all the individual evaluations). Please let us know what our next steps will be, and note that Jana Palcer [a parent advocate] will be attending the 2.5.16 ARD for our support.

Shortly after sending that email, Lisa M. received a call from someone in the District rescheduling the February 5 meeting to February 23.

On February 11, the District produced an "Addendum" to the January 4 FIE confirming that J.M. was eligible for special education.  The Addendum reflected that an "Other Health Impairment Form" had been received from one of J.M.'s doctors, which "[n]oted functional implications of limited alertness manifesting as lack of attention and concentration."

Sometime between the first ARD committee meeting (on January 25) and the reconvened meeting (on February 23), District staff held a "systematic review," also called a "staffing," at which the District's outside counsel was present. J.M.'s parents were not invited. The record does not clearly reflect how long this staffing lasted but a witness for the District testified that the typical staffing lasts "between an hour and two."

At the February 23 reconvened ARD meeting, the District informed J.M.'s parents of the District's new position that J.M. was *not* eligible for special education.

The parties diverge over what exactly happened at the staffing, and why the District's position changed. We will summarize each party's version.

The District describes the staffing as a "very typical procedure" designed "to review the issues and think about what could be done differently, if

No. 18-50160

anything." The District explains that, in the course of this routine re-evaluation, staff realized that "J.M. already was accessing his education and making grade level progress in the general education environment"; therefore, according to the District, staff decided to revise the District's position.

In contrast, J.M.'s parents accuse District superiors of "coach[ing]" the teachers to a finding of no-eligibility through the use of this "District-only secret meeting."[5] Regardless, it is undisputed that the District reconvened the ARD committee meeting on February 23 and, at that time, informed J.M.'s parents that the District had determined J.M. was not eligible for special education.

## Remainder of Fourth Grade

J.M. finished fourth grade with only Section 504 accommodations—no IDEA support. The District emphasizes that he "earned all As and Bs in his classes, had no discipline referrals, and interacted appropriately with his same-aged peers." J.M.'s parents counter that J.M. "complained of stomach aches" throughout the year, which demonstrated his "stress level [at] school." Lisa M. also recalls that he "was sent home very frequently, more than once or twice some weeks."

## Litigation History

Shortly after J.M.'s parents received notice that the District considered J.M. ineligible for special education, they requested a due process hearing before an SEHO. Their complaint alleged, in relevant part, that the eligibility

---

[5] Disability rights advocates, as *amici*, characterize the event as an example of a school district taking "extraordinary measures" to prevent a student with a disability from receiving special education. Brief for Disability Rights Texas and Decoding Dyslexia Texas as *Amicus Curiae* at 16-20. They cite recent findings from the United States Department of Education that school districts including Leander have taken targeted actions to decrease the number of students who qualify for special education. *Id.* at 6 (citing Letter from Ruth E. Ryder, Acting Director, OSEP, to Mike Morath, TEA Commissioner (Jan. 11, 2018), https://tea.texas.gov/WorkArea/DownloadAsset.aspx?id=51539620527).

reversal decision was substantively incorrect. The District denied the allegation, essentially arguing that J.M. was "making academic, behavioral, and social progress in the general education setting without need for specialized instruction under the IDEA."

After a two-day, 20-hour hearing at which fifteen witnesses testified, the SEHO produced a 44-page decision that ruled for J.M.'s parents on the eligibility issue.

The SEHO found a "shocking difference" in the opinions expressed by teachers and District staff at the January ARD committee meeting as compared with the February meeting. He determined that the statements made at the January meeting were "more credible" than those made at the February meeting. And he concluded that "[t]he evidence establishes a reasonable presumption that District personnel at some level intervened with [J.M.'s] teachers . . . , either directing or training them to a finding of no eligibility in the February ARDC meeting." The SEHO ordered the District to convene an ARD committee meeting and "revise the existing IEP as was planned" for the February ARD committee meeting.

Pursuant to the IDEA, 20 U.S.C. § 1415(i)(3)(B), J.M.'s parents filed a district court complaint to recover attorneys' fees. The District answered with a general denial and a counterclaim challenging the SEHO's findings of fact, conclusions of law, and relief ordered with respect to the eligibility issue. The parties filed cross-motions for judgment on the administrative record. Ruling for J.M.'s parents, the district court agreed with the SEHO that J.M. met IDEA eligibility criteria.

The District now appeals the district court's decision. The District concedes that J.M. was a student with a qualifying disability under the IDEA but disputes that J.M. *needed* special education.

## STANDARDS OF REVIEW

The district court's review of the SEHO's determination is "virtually *de novo*." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993). That is, "[a]lthough the district court is to give 'due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence.'" *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). Under 20 U.S.C. § 1415(i)(2)(C), a district court must "receive the records of the administrative proceedings" and, "basing its decision on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate."

"Accordingly, in IDEA proceedings, summary judgment is not directed to discerning whether there are disputed issues of fact, but rather, whether . . . there has been compliance with IDEA's processes and . . . the child's educational needs have been appropriately addressed." *Seth B. ex rel. Donald B. v. Orleans Parish Sch. Board*, 810 F.3d 961, 967 (5th Cir. 2016) (internal citations omitted).

On appeal, we review the district court's decision as a "mixed question of law and fact." *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012). "Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate." *Seth B.*, 810 F.3d at 967 (quotation omitted). Within that analysis, the district court's underlying findings of fact receive clear error deference. *R.P.*, 703 F.3d at 808. Under the clear error standard, we will not reverse the district court's findings unless we are "left with a definite and firm conviction that a mistake has been committed." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) (quotation omitted).

No. 18-50160

Because "Congress left the choice of educational policies and methods . . . in the hands of state and local school officials," the role of the judiciary under the IDEA is "purposefully limited." *White ex rel. White v. Ascension Parish Sch. Board*, 343 F.3d 373, 377 (5th Cir. 2003) (quoting *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir. 1996)).

## DISCUSSION

The only issue before us is whether J.M. needed special education.[6] At the threshold, however, we must address whether to review the eligibility determination considering the events that transpired afterwards (that is, with the benefit of hindsight) or whether, instead, we should consider it only with the information contemporaneously possessed by the eligibility decision-makers.

### Whether to Assess Eligibility in Hindsight or as Contemporaneous Decision-Makers

In *D. L. by & through J.L. v. Clear Creek Indep. Sch. Dist.*, we explained that the eligibility question on appellate review is whether a student had a "present need for special education services," such that the reviewing court should not "judge a school district's determination in hindsight." 695 F. App'x

---

[6] J.M.'s parents argue that the District is judicially estopped from asserting that J.M. is ineligible for special education. "[T]he estopped party's position must be clearly inconsistent with its previous one, and . . . that party must have convinced the court to accept that previous position." *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (quotations omitted). The estoppel issue is forfeited because this is the first time the District's allegedly inconsistent positions are being challenged. *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 418 (5th Cir. 2012). "Only in an egregious case will we accept a judicial estoppel argument first raised on appeal that applies to a party allegedly taking inconsistent positions in the district court." *Id.* Far from egregious, there is no inconsistency here. During administrative proceedings, J.M.'s parents challenged the District's evaluations as procedurally deficient. The District responded that it would "defend" its assessments in that respect. The District's endorsement of its assessments was plainly limited to procedural compliance, not substantive outcome. Since the February ARD committee meeting, the District has consistently maintained that J.M. was ineligible for special education.

733, 738 (5th Cir. 2017), *as revised* (July 31, 2017) (per curiam).[7] Today, we reiterate that reasoning and determination.

While judicial review unavoidably looks backward, our task is to assess eligibility with the information available to the ARD committee at the time of its decision. An erroneous conclusion that a student is ineligible for special education does not somehow become acceptable because a student subsequently succeeds. Nor does a proper finding that a student is ineligible become erroneous because the student later struggles. Subsequent events do not determine ex ante reasonableness in the eligibility context.

We are not alone in this approach. The Ninth Circuit has held that review of a school district's eligibility determination should be assessed "at the time of the child's evaluation and not from the perspective of a later time with the benefit of hindsight." *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017). As *L.J.* put it, "We judge the eligibility decision on the basis of whether it took the relevant information into account, not on whether or not it worked." *Id.*

Our sister circuits are split on whether courts can consider hindsight evidence in a different context—when assessing the *appropriateness of an IEP. Compare R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 187 (2d Cir. 2012) (disallowing use of "evidence that [a] child did not make progress under the IEP in order to show that [the IEP] was deficient from the outset"); *with M.S. ex rel. Simchick v. Fairfax County Sch. Board*, 553 F.3d 315, 327 (4th Cir. 2009) ("[W]e have concluded that, in some situations, evidence of *actual progress* may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit."); *see also* Dennis Fan, *No IDEA*

---

[7] "An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority." *Thomas v. Tregre*, 913 F.3d 458, 464 n.4 (5th Cir. 2019), as revised (Jan. 25, 2019) (quoting *Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006)).

*What the Future Holds: The Retrospective Evidence Dilemma*, 114 Colum. L. Rev. 1503 (2014) (describing various circuit positions); Maggie Wittlin, *Hindsight Evidence*, 116 Colum. L. Rev. 1323, 1386-88 (2016) (same).

In IEP appropriateness cases, this circuit embraces hindsight evidence. *See V.P.*, 582 F.3d at 588 (5th Cir. 2009) (calling demonstrated academic and non-academic benefits "one of the most critical factors" in the analysis of whether a school district has provided a FAPE).

But IEP appropriateness is an inquiry distinct from IDEA eligibility. In our court, we consider four factors in assessing the appropriateness of an IEP: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *R.P.*, 703 F.3d at 809 (citing *Michael F.*, 118 F.3d at 253). Eligibility, by contrast, requires that a student "(1) have a qualifying disability and (2) "by reason thereof, need [ ] special education and related services." *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 382 (5th Cir. 2007) (quoting 20 U.S.C. § 1401(3)(A)).

The IEP appropriateness inquiry in this circuit considers staff implementation and student performance over a period of time whereas eligibility is a snapshot of the student's condition at the time of the eligibility determination.[8] At the eligibility determination moment, therefore, incorporating events that occur afterwards would be incongruous and, indeed, can only invite Monday morning quarterbacking.

---

[8] As J.M.'s counsel put it at oral argument, "When you're looking at eligibility, you're looking [at] a point in time," but challenges to the content of an IEP are about "implementation," that is, "how it's going, are people doing what they're supposed to, is the child getting sufficient services?"

No. 18-50160

Having established the temporal framework of review, we turn to the merits of J.M.'s eligibility.

## Relevant Law

The IDEA deems eligible for special education a "child with a disability," which is defined as a child:

> (i) with [a qualifying disability including] other health impairments, or specific learning disabilities; and
> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A).

Here, the District concedes that J.M. had the qualifying disabilities of ADHD, DCD, and SLD in the area of Written Expression.[9] The contested issue is the second prong: need. What it means to *need* special education and related services is not clear. Indeed, one scholar has described this area of law as a "mess." Mark C. Weber, *The IDEA Eligibility Mess*, 57 Buff. L. Rev. 83, 84 (2009). We begin by unpacking the terms "special education" and "related services." Then we will turn to "need."

The IDEA defines "special education" as "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). Regulations elaborate that "[s]pecially designed instruction means adapting . . . the content, methodology, or delivery of instruction [to] address the unique needs of the child that result from the child's disability [and to] ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. § 300.39(b)(3).

---

[9] As mentioned above, under federal regulations implementing the IDEA, an "[o]ther health impairment" is defined to include ADHD as long as it "[a]dversely affects [the] child's educational performance." 34 C.F.R. § 300.8(c)(9). Because the District has conceded that J.M. has a qualifying disability in the form of ADHD, it has conceded that J.M.'s ADHD adversely affects his educational performance.

No. 18-50160

The IDEA defines the term "related services" to mean "transportation, and such developmental, corrective, and other supportive services (including . . . occupational therapy. . .) as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). If a child "needs a related service and not special education, the child is not [eligible]." 34 C.F.R. § 300.8(a)(2)(i).

"[N]either the IDEA nor federal regulations" define what it means to "need" special education and related services. *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000). *See also* Robert A. Garda, Jr., *Untangling Eligibility Requirements Under the Individuals with Disabilities Education Act*, 69 Mo. L. Rev. 441, 491 (2004) (noting that the "IDEA and its regulations provide no clues whatsoever to the definition of 'need,'" and describing a "barren" legislative history on the matter). We have had few opportunities to address the question.[10]

In *Alvin Independent School District v. A.D. ex rel. Patricia F.*, we held that courts must consider the "unique facts and circumstances" of each case, including "parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior," rather than only grades and test scores. 503 F.3d at 383 (citing 34 C.F.R. § 300.306(c)(1)(i)). We also clarified that "need" should not be measured according to "whether or not [a student's] potential could be maximized via special education services." *Id.* at 384 n.9.

In *D.L.*, we confirmed that, while grades "are a consideration in determining whether special education services are necessary," they should not be the exclusive one. 695 F. App'x 733, 737–38 (citing *A.D.*, 503 F.3d at

---

[10] During oral argument, counsel for the District suggested that there are no Fifth Circuit cases specifically examining what it means for a student to "need" special education as opposed to Section 504 accommodations. That appears to be correct.

384). We also stated that there is "no presumption in favor of outside evaluators" over teachers or other school personnel. *Id.* at 737.

## Application

As is par for the course in contentious IDEA cases, the record includes evidence that supports each side. J.M. failed his mid-year benchmark tests, but some of his writing scores were apparently "not uncommon" for fourth graders. J.M. displayed "poor attention and concentration," "excessively high/low activity level," "difficulty following directions," and "difficulty staying on task," but his behaviors were sometimes "re-directable." J.M.'s neuropsychologist reported that J.M.'s "fine motor skills [were] impaired, even with consistent intervention over a number of years," but her report suggested some non-IDEA accommodations. J.M. would apparently "[act] fine at school" but then "[come] home and [fall] apart" due to academic distress.

As highlighted by the district court and the SEHO, what is factually unique about this case is how the District interpreted available information. From the fall of 2015 through January 2016, the District diligently reviewed hundreds of pages of teacher observations, clinical evaluations, progress reports, parent input, and even a self-evaluation from J.M. By January 16, the District had determined that J.M. needed special education, as evidenced by an email from special education teacher Amy Stringer to Lisa M. that stated, "I will be [J.M.]'s tracking teacher in special education." That the email referenced a draft IEP coming home with J.M. is further evidence that the District believed J.M. was eligible at that time.

The District formalized its eligibility finding at the January 25 ARD committee meeting, which lasted three and a half hours. Nine District staff members participated, including a dyslexia specialist, an occupational therapist, an education diagnostician, an assistant principal, a special education teacher, two general education teachers, and a licensed specialist in

student psychology. After detailed discussion of J.M.'s skills and challenges, the ARD committee concluded—unequivocally—that J.M. needed special education. All that remained was to negotiate the details of the IEP. On February 11, the District produced an Addendum to the FIE specifically reaffirming the District's view that "the student need[ed] special education services."

Twelve days later, after a private meeting, the District reversed its position. No meaningful new information had been acquired about J.M. According to the District, staff at this meeting determined that J.M. was already accessing his education and making appropriate progress in the general education environment.[11]

On administrative review, the SEHO characterized the District's difference in positions as "shocking" and was unconvinced by the District's explanation. After hearing live testimony from fifteen witnesses and reviewing the REED, the FIE, the FIE Addendum, and the ARD committee meeting transcripts, the SEHO found that the January ARD committee meeting was "more credible" than the February one. The SEHO made 84 additional findings of fact relating to J.M.'s educational profile and the District's eligibility assessment. In conclusion, the SEHO determined, J.M. was eligible for special education as of January 26, 2016.

---

[11] The District correctly asserts that it was required to prepare for the reconvened ARD committee meeting during the ARD committee recess, pursuant to the Texas Administrative Code. *See* 19 Tex. Admin. Code § 89.1050(g) (emphasis added) ("When mutual agreement about *all* required elements of the IEP is not achieved, the parent who disagrees must be offered a single opportunity to recess and reconvene the ARD committee meeting . . . . During the recess, the ARD committee members *must* consider alternatives, gather additional data, prepare further documentation, and/or obtain additional resource persons who may assist in enabling the ARD committee to reach mutual agreement."). But this language instructs that the staffing should have focused on "reach[ing] mutual agreement" which, in this case, would have meant adjusting the specific services proposed under the IEP—not rescinding J.M.'s eligibility altogether—because Lisa M. made clear that she agreed with the District that her son should receive special education.

No. 18-50160

Importantly, the district court afforded "due weight to the hearing officer's findings," while ultimately reaching "an independent decision based on a preponderance of the evidence." *Michael F.*, 118 F.3d at 252 (quotation omitted). Specifically, the district court "review[ed] the differences in opinion expressed at the two [ARD committee] meetings" and considered the "SEHO's credibility determinations" in concluding that the January ARD interpretations were the more compelling evidence of J.M.'s needs. The district court further found that "the testimony of J.M.'s teachers and of the District specialists at the January 25 [ARD committee] meeting support[ed] the District's initial conclusion" that J.M. needed special education.

The clear error standard precludes reversal unless the court is "left with a definite and firm conviction that a mistake has been committed." *V.P.*, 582 F.3d at 583 (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006)).

We are far from that. The district court's findings are well-supported, reasonable, and correct.

Turning first to the documentary evidence, we note that the FIE, the written summary of the January ARD meeting, the FIE Addendum, and transcript testimony at the due process hearing presented various reliable indicators of J.M.'s struggle in the general education environment as of January 26, 2016. For a few examples: J.M. failed all his December 2015 benchmark tests;[12] according to multiple teachers, J.M. struggled with "attention to task" due to "avoidance behaviors"; J.M.'s classroom teacher

---

[12] Nothing in our opinion today should be read to foreclose the possibility that a student who demonstrates some academic success might still need special education. Indeed, federal regulations specifically provide that IDEA eligibility must be granted to a disabled student "who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade." 34 C.F.R. § 300.101(c)(1).

19

observed that he had "difficulty producing written work"; J.M. displayed "excessively high/low activity level"; according to J.M.'s pediatrician, J.M. experienced "functional limitations of limited alertness manifesting as lack of attention and concentration"; according to Lisa M., J.M. suffered stomach pain due to distress over academics. That J.M. demonstrated cognitive processing ability and benefitted from Section 504 accommodations does not change the analysis.

We next turn to a category of evidence that is less immediately apparent from the face of the record: credibility. Credibility is often an important factor in IDEA cases. Sensibly so, as most judges lack the expertise to determine first-hand whether a child needs special education as opposed to a different kind of accommodation. *See White*, 343 F.3d at 377 ("Our role under the IDEA is purposefully limited.").

After a typical trial, the clear-error standard affords "greater deference" to findings "based upon determinations of credibility." *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (internal quotation omitted). "[T]he trial judge's credibility determinations are due this extra deference because only [that judge] can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* (quoting *Estate of Lisle v. Comm'r*, 541 F.3d 595, 601 (5th Cir. 2008)).

The same logic applies to the due process hearing context, which resembles a bench trial in many respects. *See Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001) (recognizing, in light of "[t]raditional notions of the deference owed to a fact finder," that a hearing officer "who receives live testimony is in the best position to determine issues of credibility"); *D.B. ex rel. C.B. v. Houston Indep. Sch. Dist.*, No. CIV.A. H-06-354, 2007 WL 2947443, at *11 (S.D. Tex. Sept. 29, 2007) ("The hearing officer,

who hears live testimony and can observe witness demeanor, is in the best position to determine issues of credibility."). The "greater deference" afforded to credibility determinations post-trial is due in the IDEA context as well.

The District urges that we should decline to credit the district court's deference to the SEHO's findings because the SEHO misunderstood applicable law in two key respects. We are unpersuaded.

First, the District accuses the SEHO of laboring under the misimpression that whether a student's disability "adversely affects" educational performance is part of the "need" inquiry, as opposed to the "qualifying disability" prong. But the SEHO properly understood that it is part of the latter.

To be sure, at one point in the due process hearing, the SEHO suggested to a witness, "Let's talk about it as . . . [if the] disabling condition is the first prong and the second prong is that it adversely affects educational performance." But, in context, that comment by the SEHO was intended to parse out the two elements of the "qualifying disability" prong. The comment, by its own terms, served as a conversation-framing technique rather than an announcement of law. No other statement during the hearing or in the SEHO's written opinion suggests that the SEHO misunderstood the elements of the eligibility inquiry. *See Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 394 n.4 (5th Cir. 2012) (one erroneous citation of the legal standard following "nearly two pages of discussion correctly articulating" the standard and preceding "a 28-page description of the factual record, a 50-page summary of the parties' legal and factual briefing and 16 pages of the court's substantive analysis" was merely a "passing error").

Second, the District argues that the SEHO interpreted the "need" standard to mean that special education is necessary if it would maximize a student's potential. *See A.D.,* 503 F.3d at 384 n.9 (explaining that "need" should

not be measured according to "whether or not [a student's] potential could be maximized via special education services"). To that end, the District quotes the SEHO's observations that "it is not too late to assist [J.M.] in *overcoming* his special needs," that "educational need is learning how to *better* process his ideas and put them into writing," and that special education will provide J.M. a "*greater* ability" to do so.

The District reads the words "overcoming," "better," and "greater" to mean that the SEHO believed that J.M. already knew how to process his ideas and put them into writing. But that is not a disqualifier for special education; students with some baseline writing ability may still need special education. Moreover, the District's interpretation deconstructs the SEHO's language too finely. The SEHO made its position clear that J.M. meaningfully struggled in general education. Also, the SEHO endorsed the proposition that "Special Education is not appropriately used for a student to achieve his maximum potential," emphasizing that "Special Education will only provide [J.M.] with the same opportunity to succeed as other students, not at all assistance to meet his maximum potential."

The SEHO properly understood and applied the law.

Finally, the District suggests that "J.M. cannot 'need' special education because [J.M.'s parents] have not specified what such special education would consist of." We reject that argument. A party urging eligibility need not unilaterally identify what the IEP will entail. To the contrary, in Texas, the ARD committee is charged with preparing the IEP. *Michael F.*, 118 F.3d at 247.

In sum, the record confirms the district court's finding that J.M. met eligibility criteria for special education.

AFFIRMED.