# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 14, 2020

Lyle W. Cayce
Clerk

No. 20-10197

P.P., *a Minor Student with Disabilities, by and Through her Parents/Guardians/Next Friends*; Jennifer McCann Pinault; Ray Pinault,

>                          *Plaintiffs—Appellants Cross-Appellees*,

*versus*

Northwest Independent School District,

>                          *Defendant—Appellee Cross-Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:18-CV-578

---

Before Owen, *Chief Judge*, and King and Engelhardt, *Circuit Judges*.
Per Curiam:*

P.P. is a minor student who attended school and received special education services in the Northwest Independent School District ("Northwest") during the 2016–17 (fifth grade) and 2017–18 (sixth grade)

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-10197

academic years. Pursuant to the Individuals with Disabilities Education Act ("IDEA"), P.P. and parents, Jennifer McCann Pinault and Ray Pinault ("the Pinaults"), sought administrative relief against Northwest. Following a due process hearing, a hearing officer issued a written decision, which was then challenged in district court. The district court concluded that Northwest failed to timely identify P.P. for special education services ("child find") and to provide her a free appropriate public education ("FAPE") during the 2016–17 academic year, but declined to award compensatory relief. We reverse in part and affirm in part.

## I. BACKGROUND

P.P. is diagnosed with dyslexia and learning disabilities in reading, math, listening, and writing skills. Northwest deemed her eligible for special education services under the IDEA on February 1, 2017, after completing a Full and Individual Evaluation ("FIE"). On that same date, Northwest convened an Admissions, Review, and Dismissal ("ARD") Committee meeting with the Pinaults, where P.P.'s initial individual education program ("February 2017 IEP") was proposed and adopted.

On February 8, 2017, the Pinaults notified Northwest of their dissatisfaction with the February 2017 IEP and requested an Independent Education Evaluation ("IEE"). Northwest granted the request, but the IEE was not completed until April 5, 2017. In the interim, Northwest attempted to schedule an ARD Committee meeting with the Pinaults to address their concerns and revise the IEP, but the Pinaults refused to meet before completion of the IEE. On May 5, 2017, the ARD Committee and the Pinaults agreed to amend the February 2017 IEP without a formal meeting ("amended February 2017 IEP") to address P.P.'s failure of the reading section of the State of Texas Academic Assessments of Academic Readiness ("STAAR").

No. 20-10197

On May 25, 2017, the ARD Committee and the Pinaults met to review the IEE and discuss a revised IEP for the upcoming 2017–18 academic year. The ARD Committee proposed an IEP with more comprehensive reading and language arts goals, previously absent math and writing goals, and enrollment in Northwest's middle-school dyslexia class ("May 2017 IEP"), which would replace an elective. The Pinaults rejected the dyslexia class, because they disagreed with the program's teaching methods and did not want P.P. to sacrifice her elective. The Pinaults requested a dyslexia class taught under the Lindamood Phoneme Sequencing ("LiPS") program recommended by the IEE evaluator, Dr. Jennifer Morrison, and further requested that P.P. keep her elective. The ARD Committee responded that because Northwest's dyslexia class was a general education program and not a special education program, it lacked authority to make these modifications. The ARD Committee directed the Pinaults to pursue their request with the general education department and advised that all agreed-upon provisions in the May 2017 IEP could be adopted in the meantime. However, the Pinaults declined to adopt any portion of the May 2017 IEP.

On June 16, 2017, P.P. and the Pinaults (collectively "Plaintiffs"), filed an administrative complaint and request for a due process hearing, seeking compensatory education based on allegations that Northwest violated its child find and FAPE duties under the IDEA. Before the hearing, Northwest offered P.P. additional evaluations and individualized tutoring sessions during the 2017–18 academic year. Plaintiffs did not accept these offers. Following a two-day hearing, the hearing officer issued a written decision, finding that Northwest violated its child find duty from March to October 2016, Northwest satisfied its FAPE duty during the 2016–17 and 2017–18 academic years, and Plaintiffs failed to establish entitlement to compensatory education.

No. 20-10197

Plaintiffs and Northwest respectively sought review of the hearing officer's decision in district court. The district court issued a final judgment concluding that (1) Northwest violated its child find duty from March to October 2016; (2) Northwest violated its FAPE duty during the 2016-17 academic year; (3) Northwest satisfied its FAPE duty during the 2017-18 academic year; and (4) Plaintiffs failed to establish entitlement to compensatory education. In reaching its FAPE findings, the district court determined that the February 2017 IEP and its amendment were substantively deficient under the IDEA, but the unadopted May 2017 IEP was IDEA-compliant.

Plaintiffs appealed and Northwest cross-appealed the district court's final judgment to this court. Plaintiffs argue that the district court erred in finding that Northwest satisfied its FAPE duty during the 2017–18 academic year and in denying compensatory education. Plaintiffs further contend that the district court erred in not finding that Northwest's child find and FAPE violations began in October 2013. Northwest argues that the district court erred in finding that it violated its FAPE duty during the 2016–17 academic year.

## II. STANDARDS OF REVIEW

When reviewing a hearing officer's decision, the district court's review is "virtually *de novo*." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993). Although the district court is to give "due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997) (citation omitted). The Supreme Court has cautioned, however, that this standard is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school

authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982).

"This court, in turn, reviews legal questions *de novo* and factual questions for clear error." *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). "Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016) (citation omitted). "The district court's findings of underlying fact, such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error." *Michael F.*, 118 F.3d at 252. "Under a clear error standard, we will not reverse the district court unless we are left with a definite and firm conviction that a mistake has been committed." *R.P. ex rel R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808 (5th Cir. 2012) (citation omitted).

"Generally, on appeal, we do not address issues that were not raised in the lower court." *Vela v. City of Houston*, 276 F.3d 659, 678 (5th Cir. 2001). Plaintiffs argue on appeal that the district court erred in not finding that Northwest's child find and FAPE violations began in October 2013. However, the hearing officer's child find determination was not challenged in district court. Plaintiffs challenged the hearing officer's FAPE findings in district court, but this challenge was confined to the 2016–17 and 2017–18 academic years. Accordingly, this court will not address the child find issue and will only address the FAPE issue during 2016–17 and 2017–18 academic years.

## III. DISCUSSION

Before analyzing whether the district court erred in declining to award compensatory education, the court first turns to two underlying issues about

whether Northwest provided P.P. with a FAPE for the 2016–17 and 2017–18 academic years.

## A. FAPE

"If a determination is made that a child has a disability and needs special education and related services, an IEP must be developed for the child." 34 C.F.R. § 300.306(c)(2); *see also* 20 U.S.C. § 1414(d)(2)(A). An IEP is a "written statement" that outlines how special education and related services will be delivered to the child. 20 U.S.C. § 1414(d)(1)(A). The school district's statutory obligation to design and deliver an IEP falls under its broader duty to provide a FAPE to all IDEA-eligible students. 20 U.S.C. § 1412(a)(1).

Texas law provides statutory timelines for completing a student's FIE to determine eligibility for special education services and proposal of the student's initial IEP. 19 TEX. ADMIN. CODE § 89.1011. Texas school districts are entitled to follow these timelines, and the IDEA does not require provision of an "immediate interim FAPE or services of any kind" before the student's initial IEP proposal. *Woody*, 865 F.3d 303 at 313–22. Northwest completed P.P.'s FIE and initial IEP proposal on February 1, 2017, and Plaintiffs do not argue that Northwest failed to follow the applicable statutory timelines.

For a student integrated into the general education classroom, a school district may deprive a student of a FAPE by imposing an IEP that is not "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (emphasis in original). To determine whether a student's IEP substantively complies with the IDEA,

No. 20-10197

we consider whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) positive academic and non-academic benefits are demonstrated." *Michael F.*, 118 F.3d at 253. These factors need not be accorded any particular weight or applied in any particular way; rather, they are merely "indicators of an IEP's appropriateness . . . intended to guide [courts] in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 294 (5th Cir. 2009) (citations omitted). Nevertheless, this court has found that the fourth factor is "one of the most critical factors in this analysis." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 588 (5th Cir. 2009).

*1. Individualization*

An IEP must include a statement of the student's present levels of academic achievement/functional performance describing how her disability affects her involvement and progress in the general education curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(I). It must also contain measurable annual goals designed to meet the student's needs resulting from her disability. *Id.* § 1414(d)(1)(A)(i)(II). The district court found that the February 2017 IEP and its amendment were not individualized based on lack of specificity in stating P.P.'s present levels of academic achievement/functional performance and absence of measurable goals to comprehensively address her needs resulting from her disabilities. The district court further found that the unadopted May 2017 IEP was individualized based on its correction of these deficiencies.

P.P.'s FIE diagnosed her with dyslexia and learning disabilities in reading, math, and listening skills. The February 2017 IEP and its amendment contain a sufficient statement of P.P.'s present levels of

academic achievement/functional performance and address her reading and listening needs through goals and accommodations, however, they do not address her dyslexia and math needs. Thus, the district court did not err in concluding that the February 2017 IEP and its amendment were not individualized.

Shortly before the May 2017 IEP was proposed, P.P.'s IEE identified an additional learning disability in writing skills. The May 2017 IEP contains a sufficient statement of P.P.'s present levels of academic achievement/functional performance and addresses her dyslexia, reading, math, listening, and writing needs through goals, accommodations, and enrollment in Northwest's dyslexia class. Though the May 2017 IEP does not provide the LiPS dyslexia instruction recommended in the IEE, this court respects Northwest's discretion to develop its own educational policy for its dyslexia class. *See Rowley*, 458 U.S. at 206. Therefore, the district court did not err in concluding that the unadopted May 2017 IEP was individualized.

*2. Least Restrictive Environment*

Under the IDEA, students must be educated in the least restrictive environment "[t]o the maximum extent appropriate," with the school district ensuring that students are removed "from the regular educational environment . . . only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The district court found that Northwest educated P.P. in the least restrictive environment during the 2016–17 and 2017–18 academic years, because she was primarily enrolled in general education classes, with supplemental special education instruction in her areas of need.

During the 2016–17 academic year, P.P. was enrolled in 60 minutes per week of special education in reading and language arts, 30 minutes per

grading period of special education in content mastery, and general education classes with inclusion support. During the 2017–18 academic year, P.P. was enrolled in 30 minutes of special education in content mastery per grading period, and general education classes with inclusion support. Because P.P. was mainly educated in the general education setting with special education instruction limited to her areas of need, the district court did not err in concluding that Northwest educated P.P. in the least restrictive environment during the 2016–17 and 2017–18 academic years.

*3. Coordination and Collaboration with Key Stakeholders*

Parents, school administrators, and teachers familiar with the student's needs as "key stakeholders" should all be involved in the "highly coordinated and collaborat[ive] effort" of crafting a student's IEP. *Michael F.*, 118 F.3d at 253. The district court concluded that the May 2017 IEP was developed with key stakeholder involvement, however, the February 2017 IEP and its amendment were not, because they failed to account for the IEE requested by the Pinaults.

The district court erred in failing to recognize that Northwest could not have accounted for the IEE in developing the February 2017 IEP, because the IEE was neither requested nor completed until *after* the February 2017 IEP was proposed and adopted. Moreover, the district court erred in overlooking the fact that Northwest immediately offered to address the concerns that prompted the IEE request, however, the Pinaults refused to meet with the ARD Committee until the IEE was complete. The record confirms that Northwest never denied the Pinaults an opportunity to participate in IEP development and abided by their wishes when they were not ready to discuss IEP revisions. For these reasons, the district court erred in finding that February 2017 IEP and its amendment were drafted without

key stakeholder involvement and did not err in finding that the May 2017 IEP was drafted with key stakeholder involvement.

*4. Academic/Non-Academic Benefits*

The FAPE developed by an ARD Committee and described in an IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit [her] to benefit from the instruction." *Michael F.*, 118 F.3d at 247–48 (citation omitted). "Nevertheless, the educational benefit to which the [IDEA] refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* at 248 (citations omitted). The district court found that P.P. received academic and non-academic benefits during the 2016–17 and 2017–18 academic years through her IEPs.

During the 2016–17 academic year, P.P. made approximately two years' worth of growth in her Developmental Reading Assessment score, earned passing grades in all classes, and passed the STAAR math section. P.P.'s reading teacher testified that P.P. was able to read and comprehend grade-level text when she properly applied reading strategies learned in the classroom. Though P.P. did not pass the STAAR reading section, both the ARD Committee and the Pinaults agreed that P.P. be promoted to sixth grade.

During the 2017–18 academic year, P.P. earned As and Bs, mastered grade-level content in her assessments, and performed in the top half of her class in language arts, math, and science. Her teachers testified that she utilized reading strategies on a consistent basis, thereby increasing her reading comprehension. By January 30, 2018, she had also mastered the goals

in her annual IEP. Northwest's staff, including P.P.'s teachers, consistently testified that she made progress and did well, had excellent behavior, was social, and had friends.

Based on the overwhelming evidence of P.P.'s progress during the 2016–17 and 2017–18 academic years, the district court did not err in concluding that P.P. demonstrated positive academic and non-academic benefits through her IEPs.

*5. Conclusion*

Northwest had no duty under the IDEA to provide P.P. an interim FAPE from the start of the 2016-17 academic year through her initial IEP proposal on February 1, 2017. *Woody*, 865 F.3d at 313–22. Because P.P.'s IEPs were reasonably calculated to enable her to achieve passing marks and advance from fifth to sixth grade under the four-factor *Michael F.* analysis, P.P. received a FAPE from her initial IEP adoption on February 1, 2017, through her 2017–18 academic year. *See Rowley*, 458 U.S. at 203–04. For these reasons, the district court erred in finding that Northwest violated its FAPE duty during the 2016–17 academic year, and did not err in finding that Northwest satisfied its FAPE duty during the 2017–18 academic year.

**B. Compensatory Education**

"[C]ompensatory awards . . . are designed to provide services prospectively to compensate for a past deficient program." *Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W.*, 961 F.3d 781, 800 (5th Cir. 2020) (citation omitted). "Such awards should place children in the position they would have been in but for the violation of the [IDEA]." *Id.* (citations omitted). A compensatory award requires a "corresponding finding of an IDEA violation." *Id.* A district court reviewing a hearing officer's decision is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "The ordinary meaning of these words confers

broad discretion on the court" and "equitable considerations are relevant in fashioning relief." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 374 (1985).

The only compensable IDEA violation present is Northwest's child find violation. Plaintiffs bore the burden in the underlying due process hearing and on district court review to establish entitlement to compensatory education. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Seth B.*, 810 F.3d at 972; *Teague*, 999 F.2d at 131–32 (placing burden of proof on parents requesting remedy in the form of reimbursement for private school). The district court determined that Plaintiffs failed to meet their burden based on their failure to take advantage of remedial services offered by Northwest and the lack of relevant hearing testimony from Plaintiffs' expert and P.P.'s IEE evaluator, Dr. Morrison.

Plaintiffs argue that the district court erred by not awarding P.P. compensatory education so she can learn to read above a second-grade level and do math without counting on her fingers. Plaintiffs contend that this court should rely on Dr. Morrison's testimony and P.P.'s own testimony that she could not read sixth-grade materials, counted on her fingers for math, and used a calculator.

The record confirms that the Pinaults rejected several remedial services offered by Northwest, including a dyslexia class, individualized tutoring, and further evaluations. Additionally, the Pinaults stymied Northwest's efforts to correct deficiencies in P.P.'s initial IEPs by refusing to meet with the ARD Committee while the IEE was pending and refusing to adopt agreed-upon revisions in the proposed May 2017 IEP.

As to Plaintiffs' expert testimony, Dr. Morrison testified that she believed P.P. required compensatory education that focused on dyslexia instruction. Dr. Morrison recommended several dyslexia programs,

including LiPS, Take Flight, and the Wilson Reading Program, with approximately 240 hours of direct instructional support to remediate features of P.P.'s dyslexia. However, Dr. Morrison testified that she had no training in dyslexia instruction or intervention, never reviewed P.P.'s initial dyslexia diagnosis records, and never reviewed the instructional strategies used in Northwest's dyslexia program. She also testified that she had never taught or directly studied the LiPS program.

In contrast, Ruth Ann Beagle, Northwest's Assessment Facilitator trained in dyslexia instruction, testified regarding the appropriateness of Northwest's dyslexia program and its compliance with the Texas Dyslexia Handbook. Specifically, Ms. Beagle explained that Texas school districts may use a variety of sources to satisfy the components of dyslexia instruction; one dyslexia program is not better than another, provided the components of dyslexia instruction are present; and Northwest's dyslexia program meets the components for dyslexia instruction.

Considering Dr. Morrison's lack of experience in the dyslexia field, failure to review P.P.'s initial dyslexia diagnosis records, and inability to articulate deficiencies in Northwest's dyslexia program, coupled with Ms. Beagle's testimony regarding Northwest's compliance with Texas standards for dyslexia instruction, the district court did not err in discrediting Dr. Morrison's testimony. Moreover, in refusing to award the specific dyslexia program(s) recommended by Dr. Morrison, the district court properly declined to "adopt the problematic role of education policymaker" and refrained from "dictat[ing] which pedagogical methods a school district must consider and to what degree they must be incorporated on an individualized, case-by-case basis—an outcome the Supreme Court has specifically cautioned against." *Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 530 (5th Cir. 2019) (citing *Endrew F.*, 137 S. Ct. at 992–93; *Rowley*, 458 U.S. at 207).

No. 20-10197

Further, rather than relying on P.P.'s testimony, the hearing officer relied on the testimony from P.P.'s teachers in determining that P.P. made progress during her sixth-grade year, including being able to read and comprehend sixth-grade material. The hearing officer's reliance on testimony from P.P.'s teachers, as opposed to testimony from P.P., reflects an implicit credibility determination that is owed deference. *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 218 (5th Cir. 2019).

For these reasons, the district court did not err in using its broad remedial discretion and equitable considerations to deny compensatory education.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's finding that Northwest violated its FAPE duty during the 2016–17 academic year; AFFIRM the district court's finding that Northwest satisfied its FAPE duty during the 2017–18 academic year; and AFFIRM the district court's denial of compensatory education.